**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**July 23, 2007**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

TON SERVICES, INC., a Utah
corporation,

        Plaintiff-Appellant,

v.

QWEST CORPORATION, a Colorado
corporation,

        Defendant-Appellee.

No. 06-4052

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF UTAH**
**(D.C. NO. 1:04-CV-35-TS)**

---

Floyd A. Jensen, Floyd Andrew Jensen PLLC, Salt Lake City, Utah, for Plaintiff-
Appellant.

David A. Vogel (Douglas P. Lobel with him on the brief), Cooley Godward LLP,
Reston, Virginia, for Defendant-Appellee.

---

Before **LUCERO** and **MURPHY**, Circuit Judges, and **ROBINSON**,[*] District
Judge.

---

**MURPHY**, Circuit Judge.

---

[*]The Honorable Julie A. Robinson, District Judge, United States District
Court of the District of Kansas, sitting by designation.

## I. INTRODUCTION

The current action is one of a number of pending judicial and administrative actions raising the question whether incumbent local exchange carriers ("LECs") generally, and the former Bell Operating Companies ("BOCs") in particular, are required to provide refunds to independent payphone service providers ("PSPs") for noncompliance with the anti-discrimination and anti-subsidization requirements in 47 U.S.C. § 276(a) and Federal Communication Commission ("FCC" or "Commission") orders implementing § 276.[1]

---

[1]The Ninth Circuit recently addressed this issue in *Davel Communications, Inc. v. Qwest Corp.*, 460 F.3d 1075 (9th Cir. 2006). The *Davel* court determined the issue's resolution turned on the Commission's interpretation of a 1997 FCC order [hereinafter "Waiver/Refund Order"]. *Id*. at 1089–90. The *Davel* court invoked the primary jurisdiction doctrine and referred interpretation of the 1997 order to the FCC. *Id*. That action is now pending before the Commission. *In re Implementation of Pay Telephone Reclassification and Compensation Provisions of the Telecommunications Act of 1996*, Petition of Davel Communications, Inc., et. al for Declaratory Ruling, CC Docket No. 96-128 (filed Sept. 11, 2006) ("Davel Petition"), *available at* http://svartifoss2.fcc.gov/prod/ecfs/retrieve.cgi? native_or_pdf=pdf&id_document=6518461589.

The Davel Petition is just one of several related actions awaiting Commission consideration under Common Carrier Bureau Docket Number 96-128, entitled "In the Matter of the Implementation of Pay Telephone Reclassification and Compensation Provisions of the Telecommunications Act of 1996." *See* New England Public Communications Council, Inc., Filing of Letter from Supreme Judicial Court of Massachusetts Regarding Implementation of the Pay Telephone Compensation Provisions of the Telecommunications Act of 1996, Notice, 21 F.C.C.R. 3519, 3519 & n.3 (2006) (stating that the New England Public Communications Council requests resolution of public access line refund availability per primary jurisdiction referral from the Supreme Judicial Court of Massachusetts and explaining that the court's request will be considered in conjunction with four pending petitions for declaratory rulings from the Illinois Public Telecommunications Association, the Southern Public Communication

(continued...)

Plaintiff TON Services, Inc. ("TON") is a Utah-based PSP which owns and operates payphones in more than thirteen states. TON filed suit against Qwest Corporation ("Qwest") for violations of the Telecommunications Act of 1996 ("Act").[2] Qwest provides public access line ("PAL") services to TON in Qwest's role as an LEC.[3] Qwest also operates its own payphones in the same region as TON, making TON both a customer of Qwest and one of its competitors.

---

[1](...continued)
Association, and the Independent Payphone Association for New York, all filed in 2004, and the Florida Public Telecommunications Association, filed in January 2006). The Illinois Public Telecommunications Association recently petitioned the United States Supreme Court for certiorari on the issue of availability of refunds for noncompliance with § 276, but the petition was denied. *Ill. Pub. Telecomms. Ass'n v. Illinois Commerce Comm'n*, 127 S.Ct. 1254 (2007).

A more fact-intensive inquiry involving issues similar to those in the instant case is also pending before the FCC. *See Pleading Cycle Established for Michigan Pay Telephone Association Petition for Declaratory Ruling*, Notice, 21 F.C.C.R. 6289, 2006 WL 1519441 (2006).

[2]Qwest is a successor to the telecommunications company U.S. West Communications. *See Qwest Corp. v. AT&T Corp.*, 479 F.3d 1206, 1208 (10th Cir. 2007). U.S. West Communications was one of the BOCs formed in the wake of the breakup of AT&T in 1982. *See* 47 U.S.C. § 153(3), (4). As a successor to U.S. West, Qwest is thus subject to the regulations Congress imposed on BOCs in its 1996 overhaul of telecommunications law and regulation. *Id.* § 153(4)(B). Although some of the allegations of unlawfulness in TON's complaint occurred while Qwest was operating as U.S. West, this opinion refers at all times to the Defendant-Appellee as "Qwest" for ease of identification.

[3]PALs connect payphones to the public switched telephone network and enable payphone users to make local and long distance intrastate and interstate telephone calls. The PAL tariffs at issue in this case involve those for intrastate calls.

LECs "originate, transmit, and terminate telephone communications to customers within a given geographic calling area." *Qwest Corp.*, 479 F.3d at 1208.

In the district court, TON alleged Qwest's failure to file tariffs and supporting cost data for the PAL services Qwest provided to TON, and the PAL rates Qwest charged TON from April 1997 through April 2002, violated the anti-discrimination and anti-subsidization provisions of 47 U.S.C. § 276(a). TON further alleged Qwest's actions violated not only § 276(a), but also § 201(b), which declares unlawful a common carrier's unreasonable and unjust practices, and § 416(c), which creates an obligation to obey FCC orders. Qwest moved under Rule 12(b)(6) to dismiss TON's complaint and, pursuant to the doctrine of primary jurisdiction, asked the district court to refer TON's claims to state regulatory agencies. The district court concluded that, absent an initial administrative ruling that Qwest's filed rates from 1997 to 2002 were unlawful, the filed rate doctrine barred the relief TON sought. The court invoked the primary jurisdiction doctrine and dismissed TON's complaint without prejudice. TON moved the court to reconsider or to alter or amend the judgment. It specifically asked the court to stay its claims pending a primary jurisdiction referral to the FCC rather than dismissing its complaint. The court denied TON's motion.

This court takes jurisdiction of TON's appeal pursuant to 28 U.S.C. § 1291.[4] We conclude the district court misconstrued the nature of TON's

---

[4]The district court stated it was dismissing TON's "complaint," but the record clearly indicates the court was dismissing TON's entire action. The

(continued...)

claims and that, although a primary jurisdiction referral is appropriate, the district court's dismissal of TON's action was an abuse of the court's discretion. This court, therefore, **vacates** the district court's dismissal of TON's complaint and **remands** TON's action to the district court for further proceedings consistent with this opinion.

## II.  BACKGROUND

## A.  Statutory and Regulatory Background

An understanding of the applicable federal statutes and regulations and their background is required to properly assess TON's claims and the district court's disposition of TON's action.[5]

### 1.  The 1996 Telecommunications Act and the FCC's Payphone Orders

The telecommunications industry is regulated by Chapter 5 of the Federal Communications Act of 1934, as amended by the Telecommunications Act of 1996, codified at 47 U.S.C. § 151 *et seq*. Prior to 1996, LECs, which owned payphone lines used by all PSPs, routinely subsidized and discriminated in favor of their own payphone services. *See New Eng. Pub. Commc'ns Council, Inc. v.*

[4](...continued)
court's dismissal without prejudice is, therefore, a final, appealable order under this court's "practical approach." *See, e.g., Moya v. Schollenbarger*, 465 F.3d 444, 449–51 (10th Cir. 2006) (quotation omitted).

[5]The developments in federal telecommunications law relevant to this appeal were recently summarized in *Davel,* a case involving claims nearly identical to those here. *See Davel Commc'ns*, 460 F.3d at 1081–83.

*FCC*, 334 F.3d 69, 71 (D.C. Cir. 2003).  In 1996, in an effort to increase competition in the payphone industry and ensure widespread access to payphones, Congress prohibited BOCs from subsidizing their own payphone services with revenues from their other operations and from discriminating in favor of their own payphone services.  *See* 47 U.S.C. § 276(b), (a).[6]  Section 276(a) reflects congressional intent to "replace a state-regulated monopoly system with a federally facilitated, competitive market." *New Eng. Pub. Commc'ns Council*, 334 F.3d at 77.  In § 276(b)(1)(C), Congress directed the FCC to adopt nonstructural safeguards to implement § 276(a) by preventing BOCs from cross-subsidization of their payphone services.  "In essence, a BOC must place its own payphones on equal footing with those that PSPs operate, and it must not obtain a profit from PSP payphones." *Nw. Pub. Commc'ns Council v. Pub. Util. Comm'n*, 100 P.3d 776, 779 (Or. Ct. App.  2004) (Wolheim, J., concurring).  The instrument the FCC chose to implement § 276(b)(1)(C) is the so-called "New Services Test" ("NST"), which mandates that tariff rates should be based solely on a carrier's overhead costs.  *See* 47 C.F.R. § 61.49(g)(2).[7]

_____

[6] Section 276(a) states that, after the effective date of FCC rules promulgated pursuant to § 276(b), "any Bell operating company that provides payphone service—(1) shall not subsidize its payphone service directly or indirectly from its telephone exchange service operations or its exchange access operations; and (2) shall not prefer or discriminate in favor of its payphone service."

[7]The regulation at 47 C.F.R. § 61.49(g)(2) states, "Each tariff filing
(continued...)

The FCC explained the process by which LECs should demonstrate NST compliance in a series of orders known collectively as the "Payphone Orders," issued under Common Carrier Bureau Docket Number 96-128, entitled "In the Matter of Implementation of Pay Telephone Reclassification and Compensation Provisions of the Telecommunications Act of 1996." *See Davel Commc'ns, Inc. v. Qwest Corp.*, 460 F.3d 1075, 1081 (9th Cir. 2006); *New Eng. Pub. Commc'ns Council*, 334 F.3d at 71–72. Although the FCC's initial order directed all PAL tariffs to be filed with the FCC itself, 11 F.C.C.R. 20541, 20614–16 ¶¶ 146–48, 1996 WL 547458 (1996) ("Initial Payphone Order"), its Order on Reconsideration directed LECs to file their intrastate payphone tariffs with state utility commissions. 11 F.C.C.R. 21233, 21307–08 ¶¶ 162–163, 1996 WL 658824 (1996) ("Order on Reconsideration").

In the Order on Reconsideration, the Commission explained more thoroughly the application of the NST. It indicated states should evaluate LECs'

---

[7](...continued)
submitted by a local exchange carrier . . . that introduces a new service or a restructured unbundled basic service element (BSE) . . . must be accompanied by cost data sufficient to establish that the new service or unbundled BSE will not recover more than a reasonable portion of the carrier's overhead costs."

The FCC ultimately clarified that, in the context of PAL tariffs, the NST requires a forward-looking, cost-based methodology that prohibits BOCs from charging "more for payphone line service than is necessary to recover from PSPs all monthly recurring direct and overhead costs incurred by BOCs in providing payphone lines." *In re Wisconsin Public Service Commission*, Order Directing Filings, 17 F.C.C.R. 2051, 2069 ¶ 60, 2002 WL 122570 (2002) ("New Services Test Order").

PAL tariffs to ensure they were "(1) cost-based; (2) consistent with the requirements of Section 276 with regard, for example, to the removal of subsidies from exchange and exchange access services; and (3) nondiscriminatory." *Id.* at 21308 ¶ 163. All tariffs were required to be filed by January 15, 1997, and effective by April 15, 1997. *Id.* The FCC clarified that the tariff filings were to be accompanied by supporting cost data as provided for in 47 C.F.R. § 61.49(g)(2). *See id.* at 21308 ¶ 163 & n.492. The Commission further provided that, where LECs had already filed intrastate tariffs for PAL rates and other unbundled services, the states were permitted, "after considering the requirements of this order, [to] conclude: 1) that existing tariffs are consistent with the [Initial Payphone] report and order as revised herein; and 2) that in such case no further filings are required." *Id.* at 21308.[8] Finally, the Commission explicitly retained jurisdiction over intrastate tariffs in the event a state was "unable" to review intrastate tariffs for NST compliance. *Id.* at 21308 ¶ 163.

In a separate section of the Order on Reconsideration, the FCC addressed the special requirements an LEC must satisfy to recover costs for connecting calls

---

[8]The Commission later determined the scope of the Order on Reconsideration was too broad and that, by statute, it was only authorized to require BOCs, rather than all LECs, to file NST-compliant PAL tariffs. *See* New Services Test Order, 17 F.C.C.R. at 2060–61 ¶ 31. Because Qwest is a BOC, the narrowing of the filing requirements had no effect on Qwest's obligations.

from its payphones to long distance service providers.[9] *Id.* at 21293 ¶ 131. To promote compliance with the requirements of paragraph 163, the Commission ordered that an LEC which itself owns and operates payphones would not be permitted to recover "per-call compensation" (also frequently referred to as "dial-around compensation") for allowing calls from its payphones to be connected to long distance carriers until the LEC was able to certify it had completed paragraph 163's requirements for implementing the § 276 regulatory scheme. *Id.* at 21293 ¶ 131. As part of its certification obligation, an LEC would have to certify its tariff rates were NST compliant, i.e., that they "reflect[ed] the removal of charges that recover the costs of payphones and any intrastate subsidies." *Id.* A further order issued by the Common Carrier Bureau of the FCC eleven days prior to the April 15, 1997, effective date for NST-compliant tariffs again emphasized the link between NST compliance and an LEC's qualification to recover per-call compensation. *See* 12 F.C.C.R. 20997, 21011 ¶¶ 29–30, 1997 WL 159904 (1997) ("Bureau Waiver Order") (emphasizing that BOCs must meet the Order on Reconsideration's state tariffing requirements before being eligible to receive per-call payphone compensation).

---

[9]All payphone providers are entitled to compensation from long distance carriers for connecting payphone customers to the long distance carrier of the customer's choice. *See* 47 U.S.C. § 276(b)(1)(A); 47 C.F.R. § 64.1300.

*2.    BOC Waiver Request and the FCC's Waiver/Refund Order*

On April 10, 1997, five days before NST-compliant intrastate PAL tariff rates were to be effective, the coalition of Regional Bell Operating Companies ("RBOC Coalition") asked the FCC to delay the effective date for NST-compliant intrastate tariffs for forty-five days. The RBOC Coalition's letter stated the BOCs had not previously understood the Payphone Orders to require that rates for existing, previously tariffed intrastate payphone services had to comply with the NST. The RBOC Coalition requested an extension until May 19, 1997, to file new, NST-compliant tariffs in states where existing tariffs were not NST compliant, but asked to be allowed to begin collecting per-call compensation as scheduled on April 15. In exchange for the ability to receive per-call compensation as scheduled, the BOCs volunteered to reimburse or credit PSPs in states where the new, NST-compliant rate was lower than the prior tariff rate. In a follow-up letter on April 11, 1997, the RBOC Coalition explained, "The waiver will allow LECs . . . to gather the relevant cost information and either be prepared to certify that the existing tariffs satisfy the costing standards of the "new services" test or to file new or revised tariffs that do satisfy those standards."

The FCC approved the RBOC Coalition's request for a waiver in an April 15, 1997, order. 12 F.C.C.R. 21370, 21379 ¶ 19, 1997 WL 180285 (1997) ("Waiver/Refund Order"). In its Waiver/Refund Order, the Commission granted LECs a "limited waiver" until May 19, 1997, to "enable[] LECs to file intrastate

tariffs consistent with the 'new services' test of the federal guidelines detailed in the *Order on Reconsideration* and the *Bureau Waiver Order*, including cost support data." *Id.* at 21370–71 ¶ 2 (footnote omitted). Under the Waiver/Refund Order, an LEC would "remain eligible to receive [per-call] payphone compensation on April 15, 1997" provided it was able to certify it had met all the other prerequisites set out in paragraph 131 of the Order on Reconsideration. *Id.* at 21371 ¶ 2. The Commission indicated, however, "A LEC who seeks to rely on the waiver granted in the instant Order must reimburse its customers or provide credit from April 15, 1997 in situations where the newly tariffed rates, when effective, are lower than the existing tariffed rates." *Id.* Finally, the Commission specified, "The existing intrastate payphone service tariffs will continue in effect until the intrastate tariffs filed pursuant to this Order become effective." *Id.* at 21379 ¶ 19.

The Commission ordered the states to "act on the tariffs filed pursuant to this Order within a reasonable period of time," *id*. at 21379 ¶ 19 n.60, but was silent as to whether the LECs, PSPs, or the Commission itself should take action if the states failed to conduct the inquiry required by the Payphone Orders and was similarly silent on a suggested process for regulators or PSPs to follow if LECs failed to submit the required tariffs and supporting documentation.

*3.      Other FCC Orders*

Several other FCC orders provide guidance about BOCs' obligations in complying with the FCC's NST requirements. These orders make clear the Commission's intention that LECs are to bear the burden of demonstrating NST compliance to regulators and illuminate the difference between the per-call compensation "certification" requirement and the burden of demonstrating actual NST compliance.

As to the burden placed on LECs to demonstrate NST compliance, in 2000, after the Wisconsin Public Service Commission declined jurisdiction to consider whether four Wisconsin LECs' tariffs were NST compliant, the FCC's Common Carrier Bureau invoked its own jurisdiction under § 276 to ensure the LECs' compliance. *See In re Wisconsin Public Service Commission*, 15 F.C.C.R. 9978, 9980 ¶ 5, 2000 WL 232182 (2000) ("Bureau Wisconsin Order"). The Common Carrier Bureau required the LECs to submit "a copy of a tariff and supporting information." *Id.* at 9981 ¶ 7. Each LEC subject to the Bureau Wisconsin Order was instructed to "submit complete cost studies with full documentation" for each rate element. *Id.* The Order stated "[t]o satisfy the new services test, an incumbent LEC filing payphone line rates *must demonstrate* that the proposed rates do not recover more than the direct costs of the service plus a 'just and reasonable portion of the carrier's overhead costs.'" *Id.* at 9981 ¶ 9 (quoting 47 C.F.R. § 61.49(f)(2)) (emphasis added). It further specified, "[i]n determining a

-12-

just and reasonable portion of overhead costs to be attributed to services offered to competitors, the LEC *must justify* the methodology used to determine such overhead costs."[10]  *Id.* at 9982 ¶ 11 (emphasis added).

Upon reconsideration of the Bureau Wisconsin Order, the FCC determined it could require NST compliance only of BOCs rather than all LECs.  *See In re Wisconsin Public Service Commission,* Order Directing Filings, 17 F.C.C.R. 2051, 2060–61 ¶ 31 2002 WL 122570 (2002) ("New Services Test Order").  As to the BOCs, however, the FCC endorsed the Common Carrier Bureau's language regarding the burden of demonstrating NST compliance.  *Id*. at 2069 ¶ 58 ("Consistent with Commission precedent, the BOCs bear the burden of justifying their overhead allocations for payphone services and demonstrating compliance with our standards."); *see also Nw. Pub. Commc'ns Council*, 100 P.3d at 781 (Wollheim, J., concurring) (stating that, under the NST, BOCs "must affirmatively justify their overhead allocations").  Unlike the Bureau Wisconsin Order, which explicitly applied only to the four Wisconsin LECs named in the

_____

[10]Although the Bureau Wisconsin Order applied only to the Wisconsin LECs specifically identified in the Order, 15 F.C.C.R. 9978, 9982 ¶ 13, 2000 WL 232182 (2000), the language is indicative of the Commission's understanding of how its regulations should be interpreted to ensure BOC compliance with 47 U.S.C. § 276(a).

Notably, U.S. West Communications was a member of the coalition requesting a stay of the Bureau Wisconsin Order.  *See LEC Coalition Files Petition for Stay and Application for Review*, Public Notice, 15 F.C.C.R. 6238, 2000 WL 369637 (2000).  Presumably, then, U.S. West was familiar with the supporting data the Commission expected LECs to provide to state commissions in support of their intrastate tariff rates.

Order, 15 F.C.C.R. at 9982 ¶ 13, the New Services Test Order was intended to apply to BOCs generally. New Services Test Order, 17 F.C.C.R. at 2151 ¶ 2; *see also New Eng. Pub. Commc'ns Council*, 334 F.3d at 75 (stating the New Services Test Order "establishes a rule that affects payphone line rates in every state").

A separate line of FCC adjudicatory orders distinguishes the relatively easy process of LEC "certification" for the purposes of receiving per-call compensation, referenced in the Order on Reconsideration, 11 F.C.C.R. at 21293 ¶ 131, from the far more burdensome process of ensuring actual NST compliance, mandated in the Order on Reconsideration's paragraph 163. In *In re Bell Atlantic-Delaware v. Frontier Communications Services, Inc.*, Mem. Op. and Order, 17 Commc'ns Reg. 955, 1999 WL 754402 (1999), the FCC declared the term "certification" meant that an LEC seeking per-call compensation from a long distance carrier had only to "attest[] authoritatively" that it had met the requirements set out in paragraph 131. *Id*. at ¶ 3. Certification, the Commission said, did not require LECs to provide a data-based demonstration of compliance to long distance carriers. *Id*.[11] The Commission explained, however, that "a

---

[11]The *Bell Atlantic-Delaware* adjudication, *In re Bell Atlantic-Delaware v. Frontier Commc'ns Servs., Inc.*, Mem. Op. and Order, 17 Commc'ns Reg. 955, 1999 WL 754402 (1999), merely reiterated the distinction made in the Waiver/Refund Order, which had specified that certification only involved an understanding between the LEC and the long distance carrier from which it sought compensation and did not involve any certification to be filed with the FCC, *see* 12 F.C.C.R. at 21380 ¶ 22, whereas NST-compliant intrastate tariffs had to be approved by state regulators, *see id*. at 21379 ¶ 18, 21381 ¶ 23.

LEC's certification letter does not substitute for the LEC's obligation to comply with the requirements as set forth in the *Payphone Orders*." *Id.* at ¶ 28. It reiterated that "[d]etermination of the LEC's compliance [with the *Payphone Orders*] . . . is a function solely within the Commission's and the state's jurisdiction," *id.*, thereby implicitly emphasizing the difference between per-call compensation "certification" and the process of obtaining approval of NST-compliant tariff rates. *See also In re Ameritech Ill. v. MCI Telecomms. Corp.*, Mem. Op. and Order, 1999 WL 1005080 at ¶ 19 (1999) (determining two letters submitted by U.S. West to long distance carrier MCI certifying U.S. West's compliance with paragraph 163 of the Order on Reconsideration satisfied U.S. West's certification obligations under paragraph 131 and the *Bell Atlantic-Delaware* adjudication's articulation of those obligations).

## B.    Factual Background

At the heart of TON's complaint is the allegation that, from April 1997 to April 2002, Qwest failed to file new intrastate PAL tariffs with state regulatory commissions and also failed to file cost data supporting the rates in its existing tariffs as required by 47 C.F.R. § 61.49(g)(2) and the FCC's Order on Reconsideration and Waiver/Refund Order. TON alleges that once Qwest filed new tariffs in April 2002, its new PAL rates were "substantially lower" than its prior rates, giving rise to the inference that TON's prior rates were not NST compliant and triggering Qwest's duty to pay refunds under the terms of the

Waiver/Refund Order. TON contends Qwest's actions violated § 276(a), the Act's requirement that BOCs may not subsidize or discriminate in favor of their own payphone services; § 201(b), the provision declaring unlawful any unjust or unreasonable practice by a common carrier; and § 416(c), which declares it the duty of all persons to comply with FCC orders.[12] Because it alleges Qwest failed to act in accordance with provisions of the Act, TON claims it is entitled to bring an action for damages in federal court. *See* 47 U.S.C. §§ 206 (damages) and 207 (election of forum either in FCC or federal court).

Qwest filed a motion to dismiss, claiming the filed rate doctrine, the prohibition on retroactive ratemaking, the primary jurisdiction doctrine, and the statute of limitations barred TON's ability to proceed in federal court. Qwest's basic argument to the district court was that the regulatory agencies in each of the states in which Qwest's tariffs were to be filed were in the best position to determine whether Qwest's pre-2002 rates were "reasonable." A "reasonableness" review, Qwest alleged, is the only review to which TON was entitled because the filed rate doctrine precludes the payment of refunds on filed tariffs unless such tariffs are declared to be unreasonable and unlawful. Qwest urged the district court to resist adjudicating the "threshold issue in the lawsuit –

---

[12]TON's complaint also includes state common law unjust enrichment, third-party beneficiary contract, and conversion claims based on the facts underlying its federal claims, as well as a federal claim based on Qwest's failure to file fraud protection service tariffs and related cost studies with the FCC. Neither party addresses these ancillary claims on appeal.

whether Qwest's tariffed rates were consistent with applicable regulations" because, under the primary jurisdiction doctrine, that issue falls within the "exclusive province" of administrative agencies.

TON, in response, contended it was not challenging the reasonableness of Qwest's rates, but was instead challenging Qwest's unlawful failure to file NST-compliant rates or supporting documentation and Qwest's failure to pay refunds under the Waiver/Refund Order once it filed NST-compliant rates in 2002. TON then provided several reasons for the inapplicability of the filed rate doctrine. TON further argued referral to state agencies or the FCC was unnecessary because it sought relief for Qwest's failure to file required rates and cost data, an issue which a federal court is equipped to adjudicate and which does not involve agency expertise or policymaking discretion. TON also claimed the calculation of damages would require no special expertise.

In the event of a primary jurisdiction referral, however, TON requested the court stay rather than dismiss its case because of its concern that the statute of limitations might bar refiling the case with the FCC and because dismissal would deny TON its right to a judicial forum as provided by § 207. Finally, TON refuted Qwest's allegations that the two-year statute of limitations pursuant to § 415(b) barred its claims by asserting it could not have discovered Qwest's pre-April 2002 rates were noncompliant until Qwest filed its new rates in April 2002. As to the relief due to TON under the Waiver/Refund Order, TON argued Qwest's

reading of the Order, which would have restricted any claim to refunds to the forty-five day period between April 15, 1997, and May 19, 1997, would be a "strained reading" that is inconsistent with the purposes of § 276(a).

When ruling on Qwest's motion to dismiss, the district court labeled the parties' "chief dispute" as whether "TON's complaint allege[d] improper conduct by Qwest or whether TON is challenging the tariffed rates charged by Qwest from 1997 to 2002." Without making a threshold determination as to whether Qwest's conduct was unlawful, the court accepted Qwest's characterization of TON's complaint and concluded TON was essentially challenging the reasonableness and lawfulness of Qwest's tariffed rates. The district court stated that the question "whether these rates and associated tariffs comply with the [FCC] regulations is a question within the primary jurisdiction of state public service or regulatory commissions or the Federal Communications Commission." The district court also concluded the filed rate (or "filed tariff") doctrine barred the relief TON sought. As a result of its conclusion regarding the agency's primary jurisdiction, the court dismissed TON's action without prejudice.

TON moved the court to reconsider dismissal of its complaint. It argued that if referral to the FCC was required, the court should have stayed the federal court litigation in order to preserve TON's right to elect a federal court forum under § 207 and avoid a potential statute-of-limitations challenge by Qwest. It also argued the court could simply stay the litigation pending the FCC's

resolution of similar claims already under Commission consideration. Qwest, in response, contended that FCC orders directed payphone providers to challenge PAL rates before state regulatory agencies and, therefore, any unfair prejudice to TON based on the district court's dismissal was of its own making.

The district court denied TON's motion to reconsider, again stating its decision to invoke the doctrine of primary jurisdiction and dismiss without prejudice. It explained TON could always seek judicial review of the FCC's final order should TON decide to pursue its administrative remedies before the Commission. Without addressing TON's argument regarding the statute of limitations under § 415(b) or its election-of-forum argument under § 207, the court concluded TON would not be unfairly disadvantaged by dismissal.

TON filed an appeal in this court, raising the same arguments it made to the district court regarding the nature of its claims, the inapplicability of the filed rate and primary jurisdiction doctrines, and the prejudice it will suffer from the dismissal of its claims. TON also filed a motion to stay its appeal pending agency action.

## III. DISCUSSION

### A. Standard of Review

This court reviews *de novo* the district court's dismissal of a plaintiff's complaint on a Rule 12(b)(6) motion. Prior to the Supreme Court's recent decision in *Bell Atlantic Corp. v. Twombly*, 127 S.Ct. 1955, 1974 (2007), we

reviewed the sufficiency of a complaint *de novo* and upheld dismissal only when it appeared the plaintiff could prove no set of facts in support of the claims that would entitle him to relief. *Coosewoon v. Meridian Oil Co.*, 25 F.3d 920, 924 (10th Cir. 1994). In *Bell Atlantic*, the Supreme Court articulated a new "plausibility" standard under which a complaint must include "enough facts to state a claim to relief that is plausible on its face." 127 S. Ct. at 194; *see also Alvarado v. KOB-TV, LLC*, 2007 WL 2019752 at *3 (10th Cir. July 13, 2007) ("We look for plausibility in th[e] complaint.").[13] Under either standard, all well-pleaded factual allegations are accepted as true and construed in the light most favorable to the plaintiff. *Alvarado*, 2007 WL 2019752 at *3. For the reasons discussed below, TON satisfies its burden under either the older "no set of facts" standard or the new "plausibility" standard. As a consequence, we need not address here the potential distinctions between the two standards.

## B.   Filed Rate Doctrine

The federal filed rate doctrine, codified at 47 U.S.C. § 203, is a central tenet of telecommunications law.[14] *See MCI Telecomms. Corp. v. Am. Tel. & Tel.*

---

[13]In *Erickson v. Pardus*, 127 S. Ct. 2197, 2200 (2007), a case decided shortly after *Bell Atlantic*, the Supreme Court indicated that, even under the new "plausibility" regime, a complaint need not provide "specific facts" but need only "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." (quotation omitted).

[14]Each state in which TON operates payphones has a similar statutory provision. *See, e.g.,* Utah Code Ann. § 54-3-7. State filed rate doctrines are,

(continued...)

*Co.*, 512 U.S. 218, 229–30 (1994). The doctrine generally requires that providers of services in regulated industries, such as the communications and shipping industries, adhere to tariffs approved by and filed with the regulatory agency overseeing the industry. *See Ark. La. Gas Co. v. Hall*, 453 U.S. 571, 577 (1981); *Davel Commc'ns*, 460 F.3d at 1084. In the telecommunications context, the doctrine provides that "once a carrier's tariff is approved by the FCC [or an appropriate state agency], the terms of the federal tariff are considered to be the law and therefore conclusively and exclusively enumerate the rights and liabilities as between the carrier and the customer." *Davel Commc'ns*, 460 F.3d at 1084 (quotations omitted). In order to prevent price discrimination and preserve agencies' exclusive role in ratemaking, courts have no power to adjudicate claims which would "invalidate, alter, or add to the terms of the filed tariff." *Davel Commc'ns*, 460 F.3d at 1084 (quotation omitted); *see Hill v. BellSouth Telecomms., Inc.*, 364 F.3d 1308, 1316 (11th Cir. 2004) (discussing the rationale for the doctrine).

As the *Davel* court explained, however, "[T]he filed-rate doctrine does not bar a suit to enforce a command of the very regulatory statute giving rise to the tariff-filing requirement, even where the effect of enforcement [i.e., the remedy TON seeks under 47 U.S.C. § 206] would be to change the filed tariff." *Id.* at

---

[14](...continued)
however, preempted by 47 U.S.C. § 276(c).

-21-

1085.  In the context of the Interstate Commerce Act, the statute upon which the common carrier provisions of the 1934 Communications Act were modeled and from which the filed rate doctrine in the telecommunications context derives, *see Am. Tel. & Tel. Co. v. Cent. Office Tel., Inc.*, 524 U.S. 214, 222 (1998), the failure to file a required tariff has been held to defeat the application of the filed rate doctrine.  *See Rushton v. Am. Pac. Wood Prods., Inc.* (*In re Americana Expressways, Inc.*), 133 F.3d 752, 757–58 (10th Cir. 1997) (failure to file new tariffs or adopt existing tariffs foreclosed bankruptcy trustee's undercharge suit against a shipper (citing *MacLeod, Trustee for BGR Transp. Inc. v. ICC*, 54 F.3d 888, 890 (D.C. Cir. 1995))).  Qwest provides no compelling reason why the failure to file required tariffs or cost support data should not apply with equal force here.

In this case, TON alleges and provides a factual basis for its allegations that (1) Qwest failed to timely file tariffs and supporting cost data with state regulators, (2) such failures precluded regulators from determining Qwest's NST compliance, and (3) under the Waiver/Refund Order, TON was entitled to refunds once NST-compliant rates were filed.  Because "[c]arriers must comply with the comprehensive scheme provided by the statute and regulations promulgated under it[,]" the failure to comply "may justify departure from the filed rate."  *ICC v. Transcon Lines*, 513 U.S. 138, 147 (1995).  At this stage of the litigation, where the procedural posture of the case requires all allegations in the complaint to be

-22-

construed in TON's favor and this court's reading of TON's complaint demonstrates that TON's central challenge involves Qwest's procedural compliance with FCC orders and regulations rather than a challenge to the reasonableness of Qwest's rates, the filed rate doctrine cannot categorically preclude TON's claims.[15]  *Accord Davel Commc'ns*, 460 F.3d at 1085.  The district court's conclusion to the contrary, and its reliance on *AT&T v. Central Office Telephone*, an inapposite case involving state law contract and tort claims, was erroneous.

Moreover, TON's complaint alleges the Waiver/Refund Order put Qwest on notice that it might owe PSPs a refund on its previously filed rates and asserts that Qwest was part of the coalition which initially proposed the refund.[16]

---

[15]Until it is determined (1) whether Qwest's procedural noncompliance with the NST gives rise to a violation of 47 U.S.C. §§ 201(b), 276(a), or 416(c), and (2) whether Qwest's tariffed rates complied substantively with the NST, it is impossible to determine whether the filed rate doctrine bars TON's claims.  Only if both of these issues are resolved against TON would the filed rate doctrine likely preclude TON's ability to proceed in federal court.

[16]Although the filed rate doctrine ordinarily precludes a claim or the assertion of a defense where a supplier and customer agree to a rate different than the filed tariff rate, *see, e.g., Reiter v. Cooper*, 507 U.S. 258, 266 (1993), it is not clear that result would apply here.  In this case, the RBOC Coalition explicitly promised the FCC that, notwithstanding the filed rate doctrine, the BOCs would "voluntarily undertake" to provide a "retroactive rate adjustment" in the event their NST-compliant rates were lower than their prior rates in exchange for permission to delay the effective date for NST-compliant tariffs.  In the usual case, the doctrine is intended to avoid discriminatory pricing in relation to particular customers.  *Maislin Indus., U.S., Inc. v. Primary Steel, Inc.*, 497 U.S. 116, 127–28 (1990).  In this case, however, the change in rates would have

(continued...)

*See* Waiver/Refund Order, 12 F.C.C.R. at 21375–76 ¶¶ 13–14 (discussing April 10 RBOC Coalition letter to the FCC requesting a waiver); *id.* at 21379–80 ¶¶ 19–20 (specifying that an LECs' reliance on the waiver required it to provide refunds for the difference between its NST-compliant rates and its prior rates). Although it is often said the doctrine is to be strictly adhered to, *see, e.g., Maislin Indus., U.S., Inc. v. Primary Steel, Inc.*, 497 U.S. 116, 127 (1990), this court has previously held that once a party has notice about a possible future rate change, the doctrine may be inapplicable. *See Nw. Pipeline Corp. v. FERC*, 61 F.3d 1479, 1490–91 (10th Cir. 1995) ("The filed rate doctrine simply does not extend to cases in which buyers are on adequate notice that resolution of some specific issue may cause a later adjustment to the rate being collected at the time of service. Certainly, this same reasoning is especially applicable where, as here, it is the [supplier] pipeline . . . who is put on notice that its requested rate increase may be subject to refund." (quotation and citations omitted)).

Finally, as the *Davel* court concluded, the Waiver/Refund Order contemplated a future "departure from a filed rate" in the form of refunds once a BOC filed NST-compliant PAL tariffs. *Davel Commc'ns*, 460 F.3d 1085–86 (relying on *ICC v. Transcon Lines*, 513 U.S. at 147). The FCC justified the

[16](...continued)
applied to all PSP customers and would have effected the congressional command in § 276(a) that PAL tariff rates not include subsidies or result in price discrimination.

departure as a means of furthering the Commission's overall policies in implementing § 276(a). *See* Order on Reconsideration, 12 F.C.C.R. at 21381 ¶ 23. *Transcon Lines* specifically approves of a regulatory agency's decision to "require[] departure from the filed rate when necessary to enforce other specific and valid regulations adopted under the Act" and emphasizes that "the [agency] can require that filed rates be suspended or set aside in various circumstances." 513 U.S. at 147. Although *Transcon Lines* involved an ICC proceeding against a particular shipper, the same logic applies to a more general order promulgated by the FCC. This is especially so where the FCC was attempting to carry out, as quickly as practicable, congressional intent to promote competition in the telecommunications industry by ensuring both the absence of subsidies for BOCs and fair compensation for all LECs. *See* 47 U.S.C. § 276(a) and (b)(1)(C). Accordingly, as the Waiver/Refund Order expressly anticipated that PSPs might be entitled to pay PAL rates lower than those on file during the waiver period, an application of the filed rate doctrine would be contrary to the purposes behind the congressionally-sanctioned regulatory scheme. *See Davel Commc'ns*, 460 F.3d at 1086.

Based on the determination that TON's claims are not, at their core, a challenge to the reasonableness of Qwest's rates, and in light of the analysis above, the filed rate doctrine does not bar TON's ability to proceed in federal court at this stage of the litigation.

## C.    Primary Jurisdiction

### 1.    *Primary Jurisdiction Doctrine*

Even where a court has subject matter jurisdiction over a claim, courts have discretion to refer an issue or issues to an administrative agency.  *Marshall v. El Paso Natural Gas Co.*, 874 F.2d 1373, 1376 (10th Cir. 1989).  The doctrine of primary jurisdiction is "specifically applicable to claims properly cognizable in court that contain some issue within the special competence of an administrative agency."  *Reiter v. Cooper*, 507 U.S. 258, 268 (1993).

The purpose of the doctrine is to "allow agencies to render opinions on issues underlying and related to the cause of action."  *Crystal Clear Commc'ns, Inc. v. Sw. Bell Tel. Co.*, 415 F.3d 1171, 1179 (10th Cir. 2005).  It is "designed to allow an agency to pass on issues within its particular area of expertise before returning jurisdiction to the federal district court for final resolution of the case." *Id.* at 1176; *see also Williams Pipe Line Co. v. Empire Gas Corp.*, 76 F.3d 1491, 1496 (10th Cir. 1996) ("[C]ourts apply primary jurisdiction to cases involving technical and intricate questions of fact and policy that Congress has assigned to a specific agency.").  The doctrine of primary jurisdiction is distinct from the concept of exhaustion, which prevents a federal court from exercising jurisdiction over a claim until all administrative remedies have been pursued.  *See United States v. W. Pac. R.R. Co.*, 352 U.S. 59, 63–64 (1956); *Mountain States Natural Gas Corp. v. Petroleum Corp. of Tex.*, 693 F.2d 1015, 1019 (10th Cir. 1982).

-26-

In this circuit, a district court's decision to invoke the primary jurisdiction doctrine "require[s] it to consider whether the issues of fact in the case: (1) are not within the conventional experience of judges; (2) require the exercise of administrative discretion; or (3) require uniformity and consistency in the regulation of the business entrusted to the particular agency." *Crystal Clear Commc'ns*, 415 F.3d at 1179. Additionally, when the regulatory agency has actions pending before it which may influence the instant litigation, invocation of the doctrine may be appropriate. *See Mical Commc'ns, Inc. v. Sprint Telemedia, Inc.*, 1 F.3d 1031, 1037–38 (10th Cir. 1993). There is, however, no "fixed formula . . . for applying the doctrine." *W. Pac. R.R. Co.*, 352 U.S. at 64. Courts should consider case-by-case whether "the reasons for the existence of the doctrine are present and whether the purposes it serves [i.e., uniformity and resort to administrative expertise] will be aided by its application in the particular litigation." *Id.*

When the primary jurisdiction doctrine is invoked, "the judicial process is suspended pending referral of such issues to the administrative body for its views." *Id.* Referral does not automatically divest the court of jurisdiction. *Reiter*, 507 U.S. at 268. The district court may retain jurisdiction over the proceedings by staying the plaintiff's claims pending agency action or, if neither party will be unfairly disadvantaged, dismissing the case without prejudice. *Id.* at 268–69; *see also Crystal Clear Commc'ns*, 415 F.3d at 1174, 1176 (explaining

-27-

district court administratively closed case but would allow it reopened upon a party's motion, indicating the court's "contemplat[ion of] continued litigation after completion of administrative proceedings").

*2.    District Court's Primary Jurisdiction Ruling*

This court applies an abuse of discretion standard to the district court's decisions to invoke the primary jurisdiction doctrine and to either stay or dismiss the action without prejudice. *S. Utah Wilderness Alliance v. BLM*, 425 F.3d 735, 750 (10th Cir. 2005). The district court in this case properly invoked the doctrine of primary jurisdiction, but did so without evaluation of the issues to be referred, the purposes to be served by referral, or a clear statement that the FCC is the appropriate agency to consider the referred issues.

The district court's invocation of the primary jurisdiction doctrine was apparently based on its mischaracterization of TON's claims. Although the court initially recognized that TON intended its complaint to be read to allege the illegality of Qwest's conduct, it ultimately concluded TON's claims were fundamentally about the reasonableness and lawfulness of Qwest's intrastate PAL tariff rates. By interpreting TON's claims in this manner, the court conflated TON's allegations concerning Qwest's procedural failure to file required tariffs and cost studies with allegations concerning the substantive unreasonableness of Qwest's rates. The court never considered whether Qwest's procedural noncompliance might have affected state regulators' ability to assess Qwest's

substantive compliance with § 276(a) and the FCC's regulations implementing that statutory provision.

In ruling on Qwest's motions to dismiss and for referral, the court simply stated *Reiter* stands for the proposition that the question whether Qwest's filed tariffs complied with the NST is within the primary jurisdiction of "state public service or regulatory commissions or the Federal Communications Commission" and that TON's relief might follow from FCC proceedings in other, related matters. The court further stated dismissal would "allow TON to determine how best to pursue an administrative decision that will resolve whether Qwest owes TON a refund" without specifying whether it was referring the case to the FCC or to state regulatory agencies. The court confused the exhaustion doctrine with the concept of primary jurisdiction when it stated it would not "interfere with the appropriate state and federal agencies by allowing [TON] to make an end-run around the established administrative remedies." *See Brown v. MCI Worldcom Network Servs., Inc.*, 277 F.3d 1166, 1173 (9th Cir. 2002) ("The [Communications Act] does not require that a plaintiff exhaust his administrative remedies before proceeding to federal court . . . . In providing a federal court forum under the [Act], Congress made it clear that it did not intend to require that suits . . . first be decided by the FCC." ). Furthermore, the court nowhere addressed the impact of §§ 206 and 207 in providing TON a private right of action in federal court, nor did it articulate how TON's rights under these

-29-

provisions might be accommodated notwithstanding a primary jurisdiction referral. *Cf. Allnet Commc'ns Servs., Inc. v. Nat'l Exch. Carrier Ass'n*, 965 F.2d 1118, 1122 (D.C. Cir. 1992). Finally, when ruling on TON's motion to reconsider its dismissal of TON's complaint, the district court failed to recognize the potential prejudice TON might suffer from dismissal.

Although this court affirms the district court's general determination that a primary jurisdiction referral is appropriate in this case, the district court erred by misidentifying the issues to be referred and failing to clearly direct its primary jurisdiction referral to the FCC. Furthermore, because TON may be prejudiced by dismissal rather than a stay of its action pending primary jurisdiction referral, the district court abused its discretion in dismissing TON's claims, albeit without prejudice. This court therefore vacates the district court's order of dismissal and remands to the district court with instructions to stay TON's claims.

a. Application of the Primary Jurisdiction Doctrine

Because FCC orders are central to defining BOCs' obligations under the Communications Act, the FCC is the appropriate body for primary jurisdiction referral. As set out below, the three *Crystal Clear Communications* factors, 415 F.3d at 1179, lead this court to identify the following three issues as meriting district court consideration for primary jurisdiction referral to the Commission: (1) whether a violation of FCC orders gives rise to statutory liability; (2) whether the PAL rates Qwest charged during the period of its procedural noncompliance

-30-

with FCC orders were substantively compliant with the NST; and, (3) if not, how damages should be calculated. Notwithstanding the number of related actions currently pending before the FCC, the district court should consider immediate referral to ensure the issues dispositive to TON's claims receive full agency consideration.[17] Factual questions outside the scope of the issues referred to the Commission should be retained and decided, when appropriate, by the district court. *See Marshall*, 874 F.2d at 1377 ("The district court is not required to defer factual issues to an agency under the doctrine of primary jurisdiction if those factual issues are of the sort that the court routinely considers.").

As detailed above in Part II.A.3, many of the FCC's orders specify LECs bear the burden of demonstrating or justifying their tariff rates to state regulators and are responsible for ensuring their rates are NST compliant.[18] *See, e.g.,* New

---

[17]Some of the most relevant actions currently pending before the Commission were filed many years ago. *See, e.g., In re Implementation of the Pay Telephone Reclassification and Compensation Provisions of the Telecommunications Act of 1996*, Illinois Public Telecommunications Association Petition for a Declaratory Ruling Regarding the Remedies Available for Violations of the Commission's Payphone Orders (filed July 30, 2004), *available at* http://svartifoss2.fcc.gov/prod/ecfs/retrieve.cgi?native_or_pdf=pdf&id_document=6516286237. Although the Commission, pursuant to 47 U.S.C. § 208(b)(1), is obligated to issue an order concluding an investigation into actions or omissions that contravene the Communications Act within five months of the filing of a complaint, the Commission's docket involving the implementation of the Act's payphone provisions clearly indicates the FCC is not complying with the statutory timetable.

[18]Contrary to Qwest's assertion that its "certification" to MCI for the purposes of receiving per-call compensation satisfied this burden, the FCC's

(continued...)

Services Test Order, 17 F.C.C.R. at 2069 ¶ 158; Bureau Wisconsin Order, 15 F.C.C.R. at 9881, 9882 ¶¶ 9,11; Waiver/Refund Order, 12 F.C.C.R. at 21379 ¶ 18. The threshold issue in this litigation, therefore, is whether Qwest's admitted failure to file new tariffs or cost data supporting its existing tariffs, which violated 47 C.F.R. § 61.49(g)(2), the Order on Reconsideration, and portions of the Waiver/Refund Order, gives rise to liability under each of §§ 201(b), 276(a), and 416(c).[19]  If Qwest's failure to meet its burden is interpreted to constitute a

[18](...continued)
orders make clear that BOCs bear a much higher burden to demonstrate actual NST compliance under paragraph 163 of the Order on Reconsideration than they do to "certify" compliance under paragraph 131. *See In re Bell Atlantic-Delaware*, 17 Commc'ns Reg. at ¶¶ 3, 28; *compare* Order on Reconsideration, 11 F.C.C.R. at 21294 ¶ 131, *with id.* at 21308 ¶ 163. "Certification" merely requires the LEC seeking compensation to "attest authoritatively" to the long distance carrier from which it seeks per-call compensation that it has complied with the prerequisites enumerated in paragraph 131 of the Order on Reconsideration. *In re Bell Atlantic-Delaware*, 17 Commc'ns Reg. at ¶¶ 3, 6; *see also In re Ameritech Ill. v. MCI Telecomms. Corp.*, Mem. Op. and Order, 1999 WL 1005080 at ¶ 19–20 (1999).  Actual compliance, in contrast, requires the submission of cost data to regulators and the receipt of state regulators' approval that tariff rates comply with the NST. *See, e.g.,* 47 C.F.R. § 61.49(g)(2); Order on Reconsideration, 11 F.C.C.R. at 21308 ¶ 163.

[19]TON contends it may assert its claims under 47 U.S.C. §§ 201(b), 276(a), and 416(c).  Qwest provides no argument to the contrary.  As a consequence, this court assumes, without deciding, that for the purposes of this appeal, a private right of action exists under each of these statutes in accordance with the facts asserted by TON. *See Burks v. Lasker*, 441 U.S. 471, 475–76 & n.5 (1979) ("The question whether a cause of action exists is not a question of jurisdiction, and therefore may be assumed without being decided."); *Mandy R. ex rel Mr. & Mrs. R. v. Owens*, 464 F.3d 1139, 1143 (10th Cir. 2006) (applying the *Burks* principle to private right of action to enforce Medicaid provisions); *see also Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 89–90 (1998) (holding that as long as a
(continued...)

violation of the Communications Act, TON is entitled to have its claim adjudicated by a federal court under § 207 and may be entitled to damages under § 206. *See* 47 U.S.C. § 206 (providing for damages arising from a common carrier's failure to do "any act, matter, or thing in this chapter required to be done"); *Global Crossing Telecomms., Inc. v. Metrophones Telecomms., Inc.*, 127 S. Ct. 1513, 1520 (2007) (holding § 207 gives payphone providers a private right of action for violation of § 201(b) as lawfully implemented by a 2003 FCC regulatory order addressing per-call compensation). In light of the Supreme Court's guidance in *Global Crossing Telecommunications* that not "every violation of FCC regulations" constitutes a statutory violation, 127 S. Ct. at 1521, and that courts should apply *Chevron* deference to the Commission's views on whether a violation of its regulations gives rise to statutory liability, *id.* at 1520–23, the district court should consider whether the FCC is in the best position to determine in the first instance if its regulatory orders contemplate that failures to comply procedurally with its regulations amount to violations of §§ 201(b), 276(a), or 416(c). A desire for uniformity in interpretation of the comprehensive regulatory scheme suggests this issue is appropriate for agency resolution. *See Crystal Clear Commc'ns*, 415 F.3d at 1179.

---

[19](...continued)
stated claim is not "frivolous or immaterial," the absence of a valid cause of action does not implicate subject matter jurisdiction). The *Davel* court made the same assumption regarding the availability of a private right of action in that case. *Davel Commc'ns*, 460 F.3d at 1085 n.3.

The district court should also consider whether agency expertise is necessary to evaluate Qwest's substantive compliance with the NST. If Qwest's procedural noncompliance gives rise to statutory liability, a substantive-compliance analysis will be necessary in order to determine whether TON may seek refunds or other damages in federal court for Qwest's violation of FCC orders. Even if a procedural violation of FCC orders does not give rise to statutory liability, a substantive evaluation of Qwest's NST compliance would nevertheless be necessary to assist the court in determining whether Qwest directly violated § 276(a)'s anti-subsidization and anti-discrimination commands. Because of the complexities of tariffing and the number of states in which Qwest was required to file NST-compliant tariffs, the district court should consider whether agency expertise is necessary for the resolution of this issue. If so, the FCC, perhaps with assistance from state regulators using the conference procedure set forth in 47 U.S.C. § 410(b), could determine whether Qwest's April 1997 to April 2002 tariff rates in each jurisdiction were cost-based and consistent with all aspects of § 276(a), including § 276's anti-discrimination and anti-subsidization requirements. *See* Order on Reconsideration, 11 F.C.C.R. at 21308 ¶ 163.

If Qwest's rates did not comply substantively with the requirements of the NST by failing to be cost-based, containing subsidies, or discriminating in favor of Qwest, TON is entitled to seek damages under § 206 for Qwest's violations of

§ 276(a).[20]  The FCC, again perhaps with the assistance of state agencies, is likely to be in the best position to calculate the difference between Qwest's pre-April 2002 noncompliant rates and rates that would have been NST compliant.  This calculation would assist the court in considering TON's claim for damages and, if appropriate, awarding such damages.

   b.  Stay of TON's Claims

Dismissal of an action pending primary jurisdiction referral is appropriate when the parties will not be prejudiced or "unfairly disadvantaged."  *Reiter*, 507 U.S. at 268–269; *United States v. Mich. Nat. Corp.*, 419 U.S. 1, 5 (1974) (per curiam) ("Dismissal rather than a stay has been approved where there is assurance that no party is prejudiced thereby."); *Far East Conference v. United States*, 342 U.S. 570, 577 (1952) (determining dismissal was appropriate where case involved only questions within the scope of agency jurisdiction, judicial review of an agency order would be available, and similar suit could be easily initiated later).  Where, for example, the relief sought is an injunction or declaratory judgment, dismissal may be appropriate.  *See, e.g.*, *Far East Conference*, 342 U.S. at 577.

Where damages are sought and the relevant statute of limitations might preclude relief, however, a stay is likely to be preferable.  *See Carnation Co. v. Pac. Westbound Conference*, 383 U.S. 213, 223 (1966) (distinguishing treble-

---

[20]If it is determined that failure to comply with FCC regulatory orders gives rise to statutory liability under §§ 201(b) and 416(c), TON could also seek recovery in its federal court action for violation of those provisions.

damages relief sought by instant plaintiff with injunctive relief sought by *Far East Conference* plaintiffs and explaining "a treble-damage action for past conduct cannot be easily reinstituted at a later time" and may face a statute-of-limitations bar). Additionally, where further judicial proceedings are contemplated, the court should ordinarily retain jurisdiction by staying the proceedings. *Davel Commc'ns*, 460 F.3d at 1091; *accord Crystal Clear Commc'ns*, 415 F.3d at 1178 n.6 (stating a stay is usual course of action in antitrust cases). Finally, where pending FCC actions may affect the outcome of a plaintiff's federal court litigation, this court has previously assumed a stay is appropriate. *Mical Commc'ns*, 1 F.3d at 1040 (raising primary jurisdiction *sua sponte* and ordering district court to stay case pending issuance of FCC ruling); *see also Davel Commc'ns, Inc. v. Qwest Corp.*, No. C03-3680P, slip op. at 6 (W.D. Wash. Jan. 29, 2007) (unpublished) (concluding, upon remand from the Ninth Circuit, the possibility of further judicial proceedings following FCC resolution of threshold issue warranted a stay).

In this case, TON alleges two potential bases for prejudice. First, because § 415(b) creates a two-year statute of limitations for damage actions before the FCC, TON contends it may be precluded from refiling its complaint before the Commission. TON asserts the statute of limitations began to run in April 2002 when Qwest filed its NST-compliant rates. *Accord Davel Commc'ns*, 460 F.3d at 1091–93 (observing that, under Davel's interpretation of the Waiver/Refund

Order, Davel's right to reimbursement came into existence only upon Qwest's filing of NST-compliant rates and, therefore, its cause of action only began to accrue when Qwest failed to pay the reimbursements). TON's limitations period, therefore, would have expired in April 2004. Second, TON alleges that § 207, which functions as an election-of-forum provision, gave it the right to file suit either in federal district court or before the FCC, but not in both fora. It contends its decision to file in federal court may foreclose it from seeking subsequent relief before the Commission.

Qwest fails to respond directly to TON's assertions. Instead, Qwest contends: 1) the decrease in its rates was caused by the FCC's revisions to the NST in the 2002 New Services Test Order and, therefore, there is no evidence that its pre-2002 rates were unreasonable or discriminatory; 2) TON's interpretation of the Waiver/Refund Order is misguided and does not entitle TON to refunds or damages; and 3) any claim that Qwest's rates became unlawful on April 15, 1997, or May 19, 1997, when Qwest failed to file new tariffs or cost studies, would have been time-barred after April or May 1999 and, therefore, are already precluded by the statute of limitations.[21] As to whether TON will be

_____

[21]Although Qwest may be correct in asserting the statute of limitations will limit TON's recovery, it is incorrect in asserting the statute of limitations will necessarily be a complete bar to recovery. TON's ability to recover for the entire April 1997 to April 2002 period based on a failure-to-file theory could be limited by the "discovery of injury" rule applied by other circuits. *See Commc'ns Vending Corp. of Ariz., Inc. v. FCC*, 365 F.3d 1064, 1073–1074 (D.C. Cir. 2004)

(continued...)

-37-

prejudiced by dismissal, Qwest says only that TON should have filed its claims with the state commissions charged with determining NST compliance rather than filing in federal court and, thus, any resulting prejudice is of TON's own making. It also claims that because the FCC is currently considering the same issues in several existing proceedings, TON "may well" get the relief it seeks without further judicial action.

Because dismissal might result in a § 415(b) statute-of-limitations bar to TON's claims under the Waiver/Refund Order and because § 207's election-of-forum provision might prevent TON from seeking agency relief, the district court abused its discretion in dismissing, rather than staying, TON's suit.

Qwest expressly declined to waive a statute-of-limitations defense before the district court and again before this court. Although it seems logical that the statute of limitations in § 415(b) would be tolled during the pendency of TON's federal court litigation, neither party has called the court's attention to any such

[21](...continued)
(stating the "discovery of injury" rule has been applied to § 415(b) by the FCC and the D.C., Third, and Ninth Circuits, where "a cause of action accrues either when a readily discoverable injury occurs or, if an injury is not readily discoverable, when the plaintiff should have discovered it"). In *Davel*, the Ninth Circuit concluded Qwest's failure to file federal fraud protection rates with the FCC beginning in 1997 put Davel on inquiry notice that Qwest failed to comply with the Payphone Orders. *Davel Commc'ns*, 460 F.3d at 1092. The *Davel* court determined Davel could only recover reimbursement on its fraud protection claims for the amounts paid under noncompliant tariffs within two years prior to Davel's filing of its federal court complaint. *Id.* at 1092–93. The same principle may limit the period of TON's right to recovery on some of its claims here.

tolling provision or related case law, nor has the court located any on its own. To the contrary, other courts have suggested the limitations period would not be tolled. *Cf. Brown*, 277 F.3d at 1173 (stating district court should stay claim during primary jurisdiction referral because statute of limitations under § 415 had run); *Davel Commc'ns*, No. C03-3680P, slip op. at 6 (recognizing risk that statute of limitations may run pending FCC's interpretation of Waiver/Refund Order). Because it appears TON may be unfairly disadvantaged by dismissal, this court concludes the district court abused its discretion by dismissing TON's complaint.

Additionally, TON asserts that § 207 entitles it to proceed in federal court, that the district court's ruling essentially denied it a federal forum, and that there is a risk, under the plain language of § 207, that it will be precluded from refiling its dismissed complaint before the Commission. Courts have consistently recognized § 207 as an "election-of-remedies provision" such that "once an election is made by either filing a complaint with the FCC or filing a complaint in federal court, a party may not thereafter file a complaint on the same issues in the alternative forum, regardless of the status of the complaint." *Premiere Network Servs., Inc. v. SBC Commc'ns, Inc.*, 440 F.3d 683, 688 (5th Cir. 2006) (citing cases). Contrary to Qwest's assertion that TON should have known it was required to file its claims before the state commissions rather than in federal court, § 207 has clearly been construed not to require exhaustion of administrative remedies. *See, e.g., Brown*, 277 F.3d at 1173; *APCC Servs., Inc. v. Worldcom,*

*Inc.*, 305 F. Supp.2d 1, 10–11 (D.D.C. 2001).  Even if, as Qwest asserts, the Commission did instruct parties to challenge an LEC's compliance with the FCC's filing requirements before state regulators, Qwest does not explain how this direction divests the court of jurisdiction under § 207 or bars TON from taking advantage of the choice Congress provided to it under § 207.  Because Qwest has engaged only in unsupported argument to the contrary, we conclude that TON's arguments regarding the nature of § 207 provide an additional reason for staying TON's claims.

Finally, contrary to the statement in its brief that TON "may well" get the relief it seeks, Qwest conceded to the district court that predicting whether TON would benefit from a positive resolution of the FCC's pending matters was like "trying to look into a crystal ball."  Qwest admitted the FCC could issue very limited orders in the matters currently pending before it which might not entitle TON to relief.  Furthermore, at oral argument before this court, Qwest conceded that, although it believed dismissal was appropriate, it did not strongly oppose a stay.

## IV.   CONCLUSION

For the reasons set forth above, the district court's dismissal of TON's complaint is **VACATED.**  This matter is **REMANDED** to the district court for further proceedings not inconsistent with this opinion, including the issuance of a stay during the pendency of any proceedings referred to the FCC.