**TELIAX, INC. d/b/a Teliax Colorado, LLC, Plaintiff/Counter–Defendant,**

v.

**AT&T CORP., Counter–Plaintiff/Defendant.**

**Civil Action No 15–cv–01472–RBJ**

United States District Court, D. Colorado.

Signed November 1, 2016

Alexander Israel Schneider, Robert H. Jackson, Marashlian & Donahue LLC, Mclean, VA, Jane Laury Wagner, Marashlian & Donahue LLC, Tyson, VA, John Frederick Young, Markus Williams Young & Zimmermann LLC, Denver, CO, for Plaintiff.

Hans J. Germann, Robert E. Entwisle, II, Mayer Brown LLP, Chicago, IL, Patrick Joseph Hickey, Rebecca B. Decook, Moye White LLP, Denver, CO, for Defendant.

## ORDER

R. Brooke Jackson, United States District Judge

This matter is before the Court on plaintiff's motion for a summary judgment dismissing defendant's counterclaim. ECF No. 59. For the reasons below, the Court GRANTS that motion.

## I. FACTS

Plaintiff Teliax, Inc. is a company that routs toll-free 1–800 or "8YY" calls in Colorado. Defendant AT & T Corp. services many of those 8YY customers. Teliax alleges that AT & T has failed to fully pay

its bills for Teliax's routing services.[1] *See* ECF No. 44 (Second Amended Complaint). AT & T counters that Teliax charges a rate applicable to "end office" services that Teliax does not in fact provide. Accordingly, AT & T has asserted a counterclaim to recoup or "claw back" an unspecified amount for these allegedly unduly-charged services. *See* ECF No. 55 (Answer to Second Amended Complaint and First Amended Counterclaim); *see In the Matter of Connect Am. Fund*, 30 F.C.C. Rcd. 1587, *8 n.83 (2015) (hereinafter "*CAF Order*") (describing the kind of counterclaim AT & T asserts here). Arguing that it was entitled to those charges, Teliax now seeks summary judgment on AT & T's counterclaim. ECF No. 59.

### Teliax and AT & T's 8YY Call Service Arrangement

Teliax is a competitive local exchange company ("CLEC") operating in Denver that provides both retail and wholesale 8YY services.[2] *Id.* at 44. (Ex. 5, Dep. of David Aldworth, at 8:6–20, 12:11–13); *id.* at 25 (Ex. 2, Aldworth Decl. at ¶7). That Teliax offers retail 8YY services means that it receives 8YY calls directly from individual end user customers to whom it provides telephone numbers.[3] ECF No. 44

at ¶16. Its wholesale 8YY service, however, operates a bit differently. Teliax has several wholesale 8YY service contracts with Local Exchange Carriers ("LECs")[4] and Interconnected Voice over Internet Protocol ("VoIP") service providers. Pursuant to those contracts, the carriers and providers deliver to Teliax's network the 8YY traffic that originates on their telecommunications systems.[5] *See* ECF No. 59 at 25–26 (Ex. 2, Aldworth Decl. at ¶¶5–6).

These voice calls commonly originate in Internet Protocol ("IP") format, which means calls that are initially sent over the internet. ECF No. 1–2 at 13 (Teliax Tariff). But they occasionally originate in older, time division multiplexing ("TDM") format, which is "[a] method of transmitting and receiving voice signals over the Public Switched Telephone Network." *Id.* at 17. Teliax nevertheless receives all of these voice calls from these wholesale providers over the internet no matter in what form the calls originated. *See* ECF No. 59 at 26 (Ex. 2, Aldworth Decl. at ¶9). This is known as "Over-the-Top" or "OTT" VoIP traffic. *See In the Matter of Verizon Commc'ns Inc. & Mci, Inc.*, 20 F.C.C. Rcd. 18433, 18479 (2005).

---

1. 8YY service "involves a subscriber agreeing to pay an interexchange carrier (IXC) for all calls made to it using a predesignated 800 number. Toll-free service thus enables a business to provide its customers, potential customers, employees, and others with a free and convenient means of contacting it." *Beehive Tel. Co., Inc. v. FCC*, 179 F.3d 941, 942 (D.C. Cir. 1999).

2. A "Competitive Local Exchange Carrier" or CLEC "is any local exchange carrier, as defined in [47 C.F.R.] § 51.5, that is not an incumbent local exchange carrier." 47 C.F.R. § 51.903(a). For a definition of an Incumbent Local Exchange Carrier or "ILEC," see *infra* n.4.

3. Teliax offers retail 8YY services over the internet, and is therefore considered a "Voice over Internet Protocol" ("VoIP") provider in addition to being labeled a CLEC.

4. LECs "are local carriers other than the incumbent local exchange carrier (or 'ILEC'), *i.e.*, the local telephone company that served a particular area prior to 1996, when the Telecommunications Act of 1996 was passed to open up local telephone service markets to competition." ECF No. 62 at 8 n.4 (citing 47 U.S.C. § 251(h)).

5. As defendant points out, it is unclear whether Teliax's wholesale providers are themselves middlemen—that is, receiving the 8YY calls they pass on to Teliax from other intermediate carriers whom originate the calls. ECF No. 62 at 11.

Upon receipt of these calls, Teliax performs a database query ("DBQ") to determine to which carrier the caller intended the call ultimately to go. *Id.* at 26 (Ex. 2, Aldworth Decl. at ¶6). Teliax then delivers these 8YY calls to the proper interexchange carrier ("IXC") (e.g. AT & T in Colorado if the 8YY number the end user customer dialed is assigned to a Colorado AT & T customer). *See id.* However, Teliax does not deliver these calls *directly* to the carrier. *Id.* Instead, Teliax delivers these calls to an intermediary "tandem" switch operated by a third party carrier. *Id.* That third party carrier, which has direct access to carriers' networks, in turn delivers the 8YY call to its final destination: the call recipient's carrier (e.g. AT & T).[6] *See id.*

### Billing Structure

As laid out above, once an 8YY call is made, that call generally moves in a linear fashion from the end user (i.e. the human being making the call) to the proper carrier of the call's intended recipient, save for a few stops in between. The money involved in this operation, however, changes hands quite a bit differently. The tandem provider ultimately delivering the 8YY call to its final destination bills AT & T directly for delivering this 8YY call. ECF No. 62–2 at 61 (Aldworth Dep.). That tandem provider then, in turn, pays Teliax a portion of that money it receives from AT & T. *Id.* at 59–61. The tandem provider also pays Teliax an additional sum so that Teliax continues to send that tandem provider the 8YY traffic Teliax receives. *Id.*

Teliax also pays its wholesale providers a set rate determined by the parties' contracts. ECF No. 62–1 at 3, 5 (Wholesale Provider Contract); ECF No. 62–2 at 61–62. Under most of their contracts, the wholesale providers and Teliax agree not to bill another company, such as AT & T, on behalf of the other party. *See, e.g.* ECF No. 62–3 at 2–3. To avoid confusion, they also agree that Teliax will be the company that bills for Tandem and DBQ services, but not necessarily end user switching services. *See id.* Finally, and most importantly for this dispute, Teliax also bills AT & T. ECF No. 62–2 at 61. With respect to its wholesale 8YY traffic, Teliax allegedly billed AT & T three separate charges: (1) an "end office switching" charge; (2) a "local switching common trunk port" charge; and (3) an "8YY database query" charge. *See* ECF No. 44 at ¶20.

For the interstate 8YY services Teliax provided to AT & T, Teliax billed AT & T certain rates for its services under Teliax's interstate tariff, known as Teliax Tariff F.C.C. No. 1 ("Tariff").[7] *See* ECF No. 1–2. Teliax must file this Tariff with the Federal Communications Commission ("FCC"). *See Qwest Corp. v. AT & T Corp.*, 371 F.Supp.2d 1250, 1250–51 (D. Colo. 2005) (explaining that "Section 203 of the Federal Communications Act of 1934, 47 U.S.C. § 203, requires all common carriers of in-

---

6. AT & T generally wants all 8YY calls delivered and Teliax generally delivers any call intended for AT & T's network. However, when Teliax has information that the 8YY is fraudulent, it attempts to automatically block that call. It also blocks internationally originated calls upon AT & T's request. ECF No. 65 at 7 n.27 (citing ECF No. 65 at 31 (Ex. 3, Panagia Dep., at 53:5–11)).

7. In the Telecommunications world, this was basically Teliax's "contract" with AT & T, although a tariff works quite a bit differently from the way typical contracts operate and is actually considered "the law." *See TON Servs., Inc. v. Qwest Corp.*, 493 F.3d 1225, 1236 (10th Cir. 2007) ("In the telecommunications context ... 'once a carrier's tariff is approved by the FCC ... the terms of the federal tariff are considered to be the law and therefore conclusively and exclusively enumerate the rights and liabilities as between the carrier and the customer.'") (quoting *Davel Commc'ns, Inc. v. Qwest Corp.*, 460 F.3d 1075, 1084 (9th Cir. 2006)).

terstate and foreign telecommunications to file a schedule of their charges, as well as the classifications, practices and regulations affecting such charges, with the [FCC]" and that "[t]his schedule is known as a tariff"). It did so in this case on September 13, 2012. *See* ECF No. 59 at 22 (Ex. 1, Roesel Decl. at ¶4).

Before the Tariff became effective, however, the parties whom Teliax would bill under the Tariff (e.g. AT & T) had a fifteen-day window to object to the terms and rates set out in that document. *See* 47 U.S.C. § 203. The FCC itself could also reject, suspend, or investigate the Tariff. *See* 47 C.F.R. §§ 61.69, 61.191. In this case, however, no party objected, and the FCC also took no action. ECF No. 59 at 22 (Ex. 1, Roesel Decl. at ¶ 5). The Tariff therefore became "effective" as of September 28, 2012. ECF No. 1–2. It was also "deemed lawful," meaning that there would now be a presumption that the rates contained therein are lawfully charged. *See* 47 U.S.C. § 204(a)(3).

Between February 2013 and February 2015 AT & T paid Teliax's access charge bills under the Tariff. ECF No. 59 at 27 (Ex. 2, Aldworth Decl. at ¶16). This purportedly occurred without incident. *See id.* Beginning in February 2015, however, AT & T allegedly began "short-paying" Teliax after reconsidering the nature of the services for which Teliax billed AT & T. *See id.* Specifically, AT & T allegedly refused to pay Teliax's "originating switched access" charge (i.e. an "end user" charge that Teliax billed AT & T for Teliax's originating 8YY traffic) or "DBQ" charge. *See id.* It argued that Teliax could not bill those rates under the law because the wholesale 8YY routing services Teliax provided to AT & T did not constitute an "end office switching" function. *See, e.g.,* ECF

No. 55 at 5 ¶21.[8] *See generally id.* In plain English, AT & T considered Teliax to be merely a middleman.

Reaching this conclusion in February of 2015, AT & T subsequently calculated a lower "national average tandem rate" and "national average DBQ rate," which it believed was a fair rate for the services Teliax in fact provided. ECF No. 59 at 27 (Ex. 2, Aldworth Decl. at ¶16). AT & T continued to pay Teliax, but it calculated what it owed Teliax based on those lower amounts. *See id.* Accordingly, from that time period through July 2016, Teliax alleges that AT & T paid it $1,777,520.25, but illegally withheld $1,339,325.94 in charges it should have paid under the rates set out in the Tariff. ECF No. 69 at 84 (Ex. 10). AT & T nonetheless counters that Teliax is the one who owes money, arguing that prior to February of 2015 AT & T had been unwittingly paying Teliax the higher end office function rate it did not legally owe. *See* ECF No. 55 at 13–14.

Procedural History

On July 13, 2015 Teliax filed suit against AT & T to recover the funds Teliax alleges AT & T owes. ECF No. 1. Amending its Complaint the same day, Teliax asserted three alternative claims for relief. *See* ECF No. 2. First, it asserted a collection action for charges pursuant to the higher rates in Teliax's Tariff, which Teliax argues AT & T refused to pay but was required to disburse by law. *Id.* at ¶¶33–44. It added a second claim based on *quantum meruit, Id.* at ¶¶45–59, and a third claim based on a theory of unjust enrichment. *Id.* at ¶¶60–74.

On September 11, 2015 AT & T answered Teliax's Amended Complaint and asserted its counterclaim for recovery of an unspecified amount that AT & T alleg-

---

**8.** AT & T allegedly refused to pay *any* of these "originating switched access" charges, de-

spite the fact that Teliax provides retail service and therefore originates those 8YY calls.

edly had overpaid as described above. ECF No. 23. AT & T likewise sought dismissal of Teliax's second and third claims for relief. *See id.* at 16. In response, Teliax filed a motion of its own to dismiss AT & T's counterclaim. ECF No. 27. The Court denied Teliax's motion, ECF No. 36, and further instructed Teliax to dismiss, without prejudice, its second and third claims, ECF No. 43.

On December 11, 2015 Teliax filed a Second Amended Complaint that removed the second and third claims for relief. ECF No. 44. AT & T answered on July 5, 2015 and amended its counterclaim against Teliax. ECF No. 55. On September 2, 2016 Teliax filed a motion for summary judgment on AT & T's counterclaim.[9] ECF No. 59. However, Teliax has not filed a motion for summary judgment on its own claim, and AT & T, although it hints that it is entitled to judgment as a matter of law on its counterclaim, see ECF No. 62 at 1, has also not filed a motion for summary judgment. Accordingly, this Order only addresses Teliax's motion for summary judgment on AT & T's counterclaim [ECF No. 59].

## II. STANDARD OF REVIEW

The Court may grant summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the burden to show that there is an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The nonmoving party must "designate specific facts showing that there is a genuine issue for trial." *Id.* at 324, 106 S.Ct. 2548. A fact is material "if under the substantive

law it is essential to the proper disposition of the claim." *Adler v. Wal–Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). A material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. The Court will examine the factual record and make reasonable inferences therefrom in the light most favorable to the party opposing summary judgment. *Concrete Works of Colo., Inc. v. City & Cnty. of Denver*, 36 F.3d 1513, 1517 (10th Cir. 1994).

## III. ANALYSIS

Though the parties' lengthy briefing tends to complicate the issues involved in this case, I believe the resolution of this dispute is fairly straightforward. I agree with Teliax that the FCC's "VoIP Symmetry Rule" or the "VSR" applies here because the plain language of the Tariff validly incorporated it. Therefore, I conclude that Teliax could lawfully charge AT & T for end office services for the OTT VoIP traffic it routed to AT & T. *See Broadvox–CLEC v. AT & T*, 8:13–cv–01130–PWG, at 3, *slip op.* (D. Md. March 31, 2016) (finding summary judgment appropriate on a similar counterclaim where "the unambiguous language of [the tariff] obligates AT & T to pay end office switching charges on OTT VoIP traffic"). Accordingly, the Court GRANTS Teliax's motion for summary judgment. After a brief discussion of the VSR and the FCC's recent order in 2015 clarifying that rule, I address its application with respect to the Tariff.

---

**9.** After this motion, Teliax filed a motion to dismiss the other originally-named defendant: BellSouth Long Distance, Inc. d/b/a/ AT & T Long Distance Service. ECF No. 60. The Court granted that motion on September 21, 2016. ECF No. 61.

## A. The "VoIP Symmetry Rule."

Throughout the last decade, technological advances in IP technology radically changed how telecommunications companies transmit telephone calls. *See CAF Order*; 47 C.F.R. § 51.913(b). Relevant here, as companies began to transmit more calls in data packets over the internet, as opposed to "wireline" from caller to called party, companies involved in transmitting these calls began to argue over how and whether VoIP providers could charge IXCs for delivering this IP traffic. *CAF Order*, at *2. Fearing the inefficiencies that resulted from the rigid application of the existing compensation system to these new IP networks, and recognizing that "the existing intercarrier compensation system was 'fundamentally in tension with and a deterrent to the deployment of IP networks,'" the FCC set out in 2011 to clarify intercarrier compensation for this VoIP–PSTN traffic.[10] *See CAF Order*, at *1.

It developed the "VoIP Symmetry Rule" ("VSR"), codified at 47 C.F.R. § 51.913(b).[11] *See id.* As the Commission explained, this rule put forward a "symmetric" approach, balancing several policy goals by allowing "VoIP providers and their LEC partners [to] have 'the same opportunity . . . to collect intercarrier compensation for VoIP–PSTN traffic as providers that use traditional telecommunications infrastructure [e.g. TDM].'" *Id.* at *3. Namely, the VSR allows CLECs (e.g. Teliax) "to charge the same intercarrier compensation as incumbent LECs under comparable circumstances for functions performed by them and/or their retail VoIP partners."[12] *Id.*

As the Commission later put it, "[t]his rule was a departure from prior Commission policy that providers were allowed to charge for services that only they themselves provided." *Id.* Instead, a CLEC could now charge for various services, including "end office" access services, which were defined as "the switching of access traffic at the carrier's end office switch and the delivery to or from of such traffic to the called party's premises." *Id.* (quoting 47 C.F.R. § 51.903(d)). Importantly, under the VSR these companies could now also charge for services that were "functionally equivalent access service[s]" of traditional, wireline "end office" switches. *Id.* at *4. Thus, the VSR allows a CLEC to charge and collect "compensation for functionally equivalent services provided outside the TDM context[,]" *id.* so long as the CLECs effectively put the companies whom it would charge these rates on notice by validly incorporating the VSR into tariffs, see 47 C.F.R. § 51.913(b).

---

**10.** "The Commission defines VoIP–PSTN traffic as 'traffic exchanged over [Public Switched Telephone Network or "PSTN"] facilities that originates and/or terminates in IP format,' and the definition is broad enough to include both interconnected and non-interconnected VoIP traffic. *See* [*Connect America Fund et al., WC Docket No. 10–90 et al., Report and Order and Further Notice of Proposed Rulemaking,* 26 FCC Rcd. 17663 (2011), *pets. for review denied sub nom.* In re FCC 11–161, 753 F.3d 1015 (10th Cir. 2014)] at 18005–06, paras. 940–41 & n.1891 (explaining that VoIP–PSTN traffic . . . includes 'interconnected VoIP,' and 'PSTN' refers to traffic exchanged in TDM format)." *CAF Order*, at *2 n.3.

**11.** The FCC first implemented that rule in their "Connect America Fund Order" on December 29, 2011. *See Broadvox–CLEC, LLC v. AT & T Corp.*, 98 F.Supp.3d 839, 845 (D. Md. 2015).

**12.** As the FCC has explained, this billing framework is a stopgap measure to assist in "the transition to an all IP network" and a "bill-and-keep regime by 2020." *CAF Order*, at *3, *9.

## B. The *CAF* Order (2015).

Despite the passage of the VSR, all did not go smoothly between CLECs, their VoIP partners, and the IXCs whom the CLECs and their partners charged for end office switching functions. For instance, in a 2015 ruling in which the Commission clarified the VSR, it chronicled many complaints from CLECs it had received since the VSR's creation in 2011. *See CAF Order*, at *6. These complaints alleged that despite the existence of the VSR two IXCs in particular, AT & T and Verizon, continued to "withhold[ ] payment for certain access elements when they partner with over-the-top VoIP providers." *Id.*

As the Commission explained, AT & T and Verizon refused to pay "based on an assertion that neither the [CLECs], nor their VoIP provider partners, provide either end office switching or the 'functional equivalent' of end office switching, and thus neither party qualifies for access charges pursuant to the VoIP symmetry rule." *Id.* Specifically, AT & T and Verizon argued that neither CLECs nor their VoIP provider partners were entitled to charge for these services because "end office switching entails the 'physical' work of connecting trunks to loops" and "this physical work occurs only when a [CLEC] partners with a facilities-based VoIP provider because such a scenario provides the last-mile transmission into a home via an actual physical facility." *Id.*

Explaining that the VSR nonetheless applied even if a CLEC partnered with a non-facilities-based VoIP provider, the Commission rejected AT & T and Veri-

zon's arguments and clarified that the VSR "does not require a [CLEC] or its VoIP provider partner to provide the physical last-mile facility to the VoIP provider's end user customers in order to provide the functional equivalent of end office switching, and thus for the [CLEC] to be eligible to assess access charges for this service." *Id.* Instead, the VSR "takes a more holistic look at how calls are delivered to the end user[.]" *Id.* at *10.

After explaining this rule, the Commission described several relevant TDM switching functions that CLECs might provide the functional equivalent of, being careful to note that the enumerated functions in its decision "do[ ] not mean that [other functions a CLEC or its over-the-top VoIP provider perform] are not ... the functional equivalent of end office switching pursuant to the [VSR]." *Id.* Rather, under the VSR "the functional equivalent of end-office switching exists when the intelligence associated with call set-up, supervision and management is provided." *Id.* Finally, the Commission reasoned "that [CLECs] and their over-the-top VoIP partners undoubtedly provide the call intelligence associated with call set-up, supervision and management." *Id.* at *11. It then went on to hold that "the call control functions provided jointly by a [CLEC] and its over-the-top VoIP partner are the functional equivalent of end-office switching."[13] *Id.*

## C. The VSR and Teliax's Tariff

As mentioned above, I agree with Teliax that its Tariff incorporated the VSR, and that it therefore applies here. *See* ECF

---

**13.** The FCC explained the traditional TDM "call control" function and the VoIP "call control" function, comparing them as follows: "Local switching ensures a connection from the transport (across the network) to the termination point (phone device). In the case of a traditional TDM call, this is accomplished

by a local switch connecting the trunk to the termination line/end-point phone device. In the case of a VoIP call, the call management system connects the packet stream crossing the Internet (transport) to the termination point (phone device)." *CAF Order* at *10.

No. 59 at 12–13. In support of that decision, I first point to the District of Maryland's decision in *Broadvox–CLEC, Inc. v. AT & T Corp,* Case No.: PWG–13–1130, *slip op.* (D. Md. March 31, 2016). There, the court granted another CLEC summary judgment on a similar end user services charge "claw back" counterclaim involving AT & T. *Id.* at 23. It found after extensive analysis of the Tariff, prior FCC orders, and relevant regulations that the language of that CLEC's tariff at issue plainly incorporated the VSR, and that it therefore applied in that case. *Id.* at 6, 10–24. Importantly, in making those holdings, the court rejected the notion that past FCC orders, such as *AT & T Corp. v. YMAX,* 26 FCC Rcd. 5742 (2011), and tariff-interpretation cases, such as *CoreTel Va., LLC v. Verizon Va., LLC,* 752 F.3d 364 F.3d (4th Cir. 2014), necessarily precluded a finding that the tariff at issue validly incorporated the VSR. *Broadvox–CLEC, Inc.,* PWG–13–1130, at 13–19.

Here, because the language in Teliax's Tariff is nearly identical in relevant respects to the language of the one at issue in *Broadvox–CLEC,* see ECF No. 59 at 89 (comparing side-by-side the language of the tariffs), I similarly conclude that Teliax's Tariff incorporated the VSR. Furthermore, because I conclude that the FCC made it clear in its 2015 clarification of that rule that the services CLECs like Teliax provide are the "functional equivalent of end-office switching[,]" see *CAF*

*Order,* at *11, I find that Teliax lawfully billed AT & T for these end user service charges, and that AT & T cannot now dispute those bills. AT & T nevertheless makes several arguments that the VSR does not apply in this case.[14] I address each in turn.

### 1. AT & T's Argument #1: The VSR Only Applies to Retail 8YY Traffic.

■ First, AT & T argues that Teliax cannot invoke the VSR because a CLEC may collect access charges under the VSR only if: (1) it provides the functional equivalent of switches access services; *and* (2) if the CLEC is listed in the database of the National Portability Administration Center ("NPAC") as providing the calling party or dialed number. ECF No. 62 at 14. It argues that this reading of the regulation is correct based on the FCC's 2015 ruling clarifying the VSR in which, AT & T argues, "the FCC made clear it was assuming that 'the LEC seeking to assess end office access charges also assigned the calling party telephone number as reflected in the database of the Number Portability Administration Center ('NPAC').'" *Id.* at 15.

I find this argument unconvincing. While the facts of the FCC's 2015 ruling involved an LEC that assigned the calling party's telephone number, the FCC also made it exceedingly clear that it was *not* address-

---

14. AT & T begins its brief in opposition by arguing that Teliax cannot charge for end-office switching functions because, as a middleman, it did not actually provide them itself. ECF No. 62 at 9–13. Teliax does not appear to argue that it actually provided end-office switching functions, at least with respect to its wholesale 8YY traffic, but rather provided their functional equivalent. ECF No. 59 at 10–13 (arguing that the VSR applies). I therefore find this first argument beside the point. Furthermore, I find Teliax's argument unconvinc-

ing because much of what AT & T cites in support of its argument are FCC orders that occurred *before* the Commission adopted the VSR. *See, e.g.,* ECF No. 62 at 10. In fact, the Commission has also since clarified that the VSR "was a departure from prior Commission policy that providers were allowed to charge for services that only they themselves provided." *CAF Order,* at *3 (referencing some of its previous orders which defendant cites in its argument).

ing or deciding the issue of whether the VSR applies in cases "where the LEC seeking to charge end office access charges does not assign the calling party['s] telephone number[s]." *CAF Order*, at *2 n.7. Therefore, contrary to what AT & T asserts here, the FCC has *not* in fact established the rule that *only* LECs whom conform to that requirement can invoke the VSR. *See id.*

Moreover, *Broadvox–CLEC* involved a CLEC attempting to invoke the VSR on VoIP calls placed by end users to whom that CLEC did not appear to assign telephone numbers. *See Broadvox–CLEC v AT & T Corp.*, 98 F.Supp.3d 839, 847 (D. Md. 2015) (stating that Broadvox "receives calls in IP format from AT & T" and then routes those calls); *Broadvox–CLEC*, 8:13–cv–01130–PWG, at 8, 21 (explaining that Broadvox charges AT & T end office switching charges for those calls, and that it does so validly under the VSR because it incorporated the VSR into its tariff). Finally, I do not buy AT & T's sweeping argument that Teliax cannot invoke the VSR on *any* of the 8YY traffic it carries because, as the facts make clear, Teliax *does* in fact provide retail services to some of the calling parties it services whom likely dialed 8YY numbers routed to AT & T customers. *See* ECF No. 59 at 44 (Ex. 5, Aldworth Dep., at 8:6–20, 12:11–13); *id.* at 25 (Ex. 2, Aldworth Decl. at ¶7).

### 2. AT & T's Argument #2: The VSR Only Applies to Traffic *Originating* in IP Format.

AT & T goes on to contend that Teliax cannot take advantage of the VSR because that rule, which according to the FCC applies to "VoIP–PSTN traffic," see *CAF Order* at *1, only contemplates "traffic that originates from end users in IP format, rather than ordinary traditional telephone traffic that is merely converted to IP for-

mat for some portion of its transmission," see ECF No. 62 at 15. According to AT & T, "Teliax has no idea whether the 8YY traffic delivered to it by its wholesale customers originated from the calling party in IP format." *Id.* at 15–16. Rather, "Teliax can determine only that the traffic is in IP format *when it is handed off to Teliax*. . . . [b]ut that says nothing about whether the traffic originated from the end user in IP format." *Id.* at 16 (emphasis in original). AT & T therefore argues that Teliax cannot invoke the VSR because it "cannot establish that the wholesale traffic it carries was VoIP–PSTN Traffic, *i.e.*, that it originated from the end-user placing the 8YY call in IP format." *Id.* at 17.

I also disagree with this argument because I find that AT & T selectively reads the definition of what constitutes "Toll VoIP–PSTN Traffic." For instance, the Commission defines VoIP–PSTN traffic to include traffic that, regardless of how it originates, nonetheless terminates in IP format. *CAF Order*, at *2 n.3 ("The Commission defines VoIP–PSTN traffic as 'traffic exchanged over PSTN facilities that originates *and/or terminates* in IP format . . . ."). Moreover, the Tariff defines "Toll VoIP–PSTN Traffic" the same way to include "traffic exchanged in [TDM] format that originates *and/or terminates* in Internet Protocol ("IP") format." ECF No. 1–2 at 17. Thus, because the undisputed facts establish that all of the 8YY traffic Teliax carries in fact terminates in IP format regardless of how it originates, see ECF No. 59 at 26 (Ex. 2, Aldworth Decl. at ¶9), I find AT & T's second argument unavailing as well.

### 3. AT & T's Argument #3: Teliax Violated its Own Tariff.

█ Next, AT & T argues that Teliax's billing was inconsistent with its Tariff. ECF No. 62 at 16. Specifically, it argues

that even though Teliax purported to incorporate the VSR, what Teliax performed, according to the "Rate Categories" definition within the Tariff, was "Tandem Switching," not an "End Office Local Switching." ECF No. 62 at 16–17. AT & T defends this interpretation by pointing out that the Tariff states that the end office local switching rate only "applies to use of the end office switch where end-user lines ('station channels') are connected" physically to their final destination, ECF No. 62 at 17, and that "Tandem Switching charges apply when the Company passes a call between the Customer and another carrier," ECF No. 62 at 17 (referencing ECF No. 1–2 at 54).

Furthermore, AT & T contends that Teliax's billing also clashes with its Tariff by pointing out that the "[T]ariff specifies that '8XX Data Base Query Service is a service offering utilizing originating trunk side Switched Access Service,'" and that the Tariff states that Teliax performs this DBQ services, for which it charges AT & T, "*[w]hen an 8XX + NXX + XXX call is originated by an end user*[.]" (emphasis in original). AT & T takes this to mean a call from an end user *of Teliax* (i.e. retail traffic), rather than an end user's call that Teliax received via a wholesale VoIP provider. ECF No. 62 at 18. It therefore argues that Teliax's billing for these DBQ services was inappropriate. *See id.*

These arguments once again fail to convince me. AT & T premises its argument about the End Office Local Switching rate versus Tandem Switching rate on its earlier contention that Teliax unsuccessfully attempted to incorporate the VSR into its Tariff. ECF No. 62 at 17 (acknowledging that while the Tariff has a section "that purports to reflect the FCC's VoIP sym-

metry rule" it cannot invoke that rule and therefore has violated its Tariff). Having found that Teliax did in fact validly incorporate the VSR into its Tariff, see *supra*, I reject AT & T argument that Teliax's billing for end office switching was improper.

Furthermore, although the Tariff appears to define what specifically constitutes "End Office Local Switching" for which an end office switching rate can be charged, see ECF No. 1–2 at 52, Teliax did not bill AT & T for that specific service.[15] Rather, under the VSR Teliax billed AT & T end user switching charges for "functionally equivalent" services. *See* ECF No. 65 at 10. According to the FCC, this was proper. *CAF Order*, at *6 ("[W]e clarify that the Commission's VoIP symmetry rule does not require a competitive LEC or its VoIP provider partner to provide the physical last-mile facility to the VoIP provider's end user customers in order to provide the functional equivalent of end office switching, and thus for the competitive LEC to be eligible to assess access charges for this service.").

I similarly find AT & T's argument regarding DBQ services unpersuasive. The Tariff's definition of an "end user" does not specify that the end user has to be one of Teliax's retail customers as AT & T would have it. Rather, it states that an "end user" is "[a]ny individual ... which subscribes to or uses interstate service provided *by a Carrier* [i.e. a 'Provider of telecommunications services for hire.']." ECF No. 1–2 at 10, 12. Thus, the Tariff's definition of "end user" is not Teliax-specific. *See id.* Teliax therefore lawfully charged DBQ services by the terms of its Tariff even if those calls originated by end users other from those with whom Teliax does retail business.

---

**15.** The FCC explicitly rejected the argument inherent in AT & T's contention here that CLECs can only bill end office charges when they partner with facilities-based VoIP providers and therefore do "the 'physical' work of connection trunks to loops." *CAF Order*, at *6.

#### 4. AT & T Argument #4: Teliax Improperly Charged for Calls that Originated Internationally.

██ Lastly, AT & T argues that Teliax did not lawfully charge AT & T for end user switching charges on 8YY calls originating abroad. ECF No. 62 at 18–19. Though it never states exactly how many of the 8YY calls Teliax routed to AT & T fall into this category, AT & T nevertheless asserts that it is not liable to Teliax for any such traffic. *Id.* at 18. To support that contention, AT & T points to 47 C.F.R. § 51.901(b), which limits the scope of transitional access service pricing rule to "interstate or intrastate exchange access, information access, or exchange services for such access . . . ." ECF No. 62 at 18. AT & T then argues that the VSR "applies only to interstate or intrastate exchange access, not international service" because the definition of the phrase "interstate communication" within 47 U.S.C. § 153(28) "does not include any communication or transmission between a point within the United States and a point in a foreign country." *Id.* at 19.

Though Teliax does not appear to challenge this crafty interpretation, it nevertheless defends its charges based on an estoppel-like argument. It argues that the facts show that AT & T "wanted all of that [international] traffic delivered to its network" regardless of the source. ECF No. 65 at 7 n.27 (citing ECF No. 65 at 31 (Ex. 3, Panagia Dep., at 53:5–11)). Therefore, Teliax contends, AT & T cannot now assert a counterclaim to recover the money it paid for those charges on traffic it wanted Teliax to send to it. *See id.* For that reason, as well as two others, I find AT & T's arguments on this point unavailing.

First, I agree with Teliax's estoppel-like argument. The undisputed facts show that AT & T not only *expected* that Teliax would deliver to it any 8YY traffic (absent fraudulent calls) that originated abroad, see ECF No. 65 at 27 (Ex. 2, Meola Dep., at 46:12–25), but that AT & T actually *wanted* those calls to be completed, see ECF No. 65 at 31 (Ex. 3, Panagia Dep., at 53:5–11). Thus, it would be exceedingly unfair at this point to let AT & T "claw back" those charges related to international calls when it in fact it expected Teliax to deliver those calls and gave Teliax no hints that it did not want to pay for them.

Second, I find AT & T's attempt to limit the scope of the VSR by referencing how the specific phrase "interstate communications" is defined under the United States Code unconvincing. As AT & T implicitly acknowledges, the concept of "interstate . . . exchange access, information access, or exchange services for such access" does not appear to have a definition within the relevant Code of Federal Regulations sections. *See* ECF No. 62 at 19 (resorting to the United States Code for a purportedly related definition); *see also* 47 C.F.R. § 903; *id.* § 51.5 (definition sections within the relevant subsections of the Code of Federal Regulations that do not define "interstate").

Given the Code of Federal Regulation's silence, AT & T instead uses the United States Code's definition of "Interstate communication" to the limit the scope of the VSR. ECF No. 62 at 19 (citing 47 U.S.C. § 153(28)). That definition, however, refers specifically to the phrases "interstate communication" or "interstate transmission[,]" which are phrases used roughly a dozen times in Title 47 of the United States Code in different contexts, and then defines those specific phrases to essentially distinguish between *inter*-state and *intra*-state transmission or communications. *See* 47 U.S.C. § 153(28) (defining "interstate" transmissions or communications to include communications or transmissions beginning and ending within different U.S.

states or territories, or the same states or territories if the communication or transmission passes through a foreign country). Therefore, I do not find defendant's argument all that convincing that this definition limits the VSR to non-international traffic.

Lastly, I do not find defendant's arguments persuasive because the Tariff does in fact define what "interstate" means, and its definition includes traffic originating abroad. It states: "For purposes of this tariff, the term Interstate applies to the regulatory jurisdiction of services used for communications between locations located in different states within the United States or between *one or more location in the United States and one or more international locations*." ECF No. 1–2 at 14 (emphasis added). Because this definition does not appear to violate the scope of the VSR, which as mentioned *supra* is unclear on this point, I find that the Tariff controls. *See PAETEC v. CommPartners*, 2010 WL 1767193, at *5 (D.D.C. 2010) (explaining that "[a] tariff filed with a federal agency is the equivalent of a federal regulation" but that "a tariff cannot be inconsistent with the statutory framework pursuant to which it is promulgated") (internal quotation marks and citations omitted). I therefore find that the Tariff's definition of "interstate" governs the scope of the VSR's application here and that AT & T cannot now "claw back" the money it previously paid Teliax for routing international calls to it.

### ORDER

For the reasons above, the Court GRANTS plaintiff Teliax's motion for summary judgment, ECF No. 59, and dismisses AT & T's counterclaim.