**SIERRA CLUB, Plaintiff,**

v.

**CHESAPEAKE OPERATING, LLC; Devon Energy Production Co., LP; SandRidge Exploration and Production, LLC; and New Dominion, LLC, Defendants.**

Case No. CIV–16–134–F

United States District Court, W.D. Oklahoma.

Signed April 4, 2017

William B. Federman, Carin L. Marcussen, Federman & Sherwood, Oklahoma

City, OK, Alex T. Gray, George N. Steel, Jeremy Y. Hutchinson, Steel Wright & Collier PLLC, Scott Poynter, Emerson Poynter LLP, Little Rock, AR, Curt D. Marshall, Robin L Greenwald, Weitz & Luxenberg PC, New York, NY, Richard Webster Washington, DC, for Plaintiff.

Bina R. Reddy, Karl S. Bourdeau, Beveridge & Diamond PC, Bradley K. Ervin, Steven J. Rosenbaum, Covington & Burling, Washington, DC, Kenneth H. Blakley, Matthew A. Paque, McAfee & Taft, Matthew C. Kane, Phillip G. Whaley, Stephen L. Jantzen, Ryan Whaley Coldiron Shandy PC, John J. Griffin, Jr., L. Mark Walker, Mary Ellen Ternes, Crowe & Dunlevy, April B. Coffin, Robert G. Gum, Gum Puckett & Mackechnie LLP, Kiran A. Phansalkar, Mitchell D. Blackburn, Conner & Winters, Oklahoma City, OK, Michael F. Smith, McAfee & Taft, Tulsa, OK, Charles B. Hampton, Ronald Glenn Franklin, McGuire Woods LLP, Houston, TX, Joy C. Fuhr, Richmond, VA, for Defendants.

## ORDER

### STEPHEN P. FRIOT, UNITED STATES DISTRICT JUDGE

Before the court are the following motions:

(1) Defendant Devon Energy Production Company, L.P.'s Motion to Dismiss Plaintiff's Complaint (doc. no. 59);

(2) Defendant New Dominion, LLC's Motion to Dismiss Plaintiff's First Amended Complaint for Declaratory and Injunctive Relief (doc. no. 61); and

(3) The Motion of Defendant Chesapeake Operating, L.L.C. to Dismiss Plaintiff's First Amended Complaint (doc. no. 63).

### Introduction

Plaintiff, Sierra Club, brings this civil action for declaratory and injunctive relief under the citizen suit provision of the Solid Waste Disposal Act, amended as the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6901, *et seq.*, specifically, 42 U.S.C. § 6972(a)(1)(B). In its amended complaint, plaintiff alleges that the deep injection of liquid waste from oil and gas extraction activities by defendants Chesapeake Operating, LLC, Devon Energy Production Co., LP, and New Dominion, LLC has contributed, and continues to contribute, to an increase in earthquakes throughout the State of Oklahoma and in southern Kansas.[1] *See,* First Amended Complaint for Declaratory and Injunctive Relief (doc. no. 49), ¶ 2. According to plaintiff, the number of earthquakes in Oklahoma increased more than 300 fold, from a maximum of 167 before 2009 to 5,838 in 2015. *Id.* at ¶ 3. Plaintiff also alleges that the severity of earthquakes has increased as the number of earthquakes has increased. *Id.* For example, plaintiff alleges that the number of magnitude 3.5 earthquakes increased 50–fold, from 4 in 2009 to 220 in 2015. *Id.* Plaintiff alleges that seismologists have stated that a magnitude 7 earthquake is possible along the Nemaha fault which runs north-northwest between Oklahoma City and southern Kansas. *Id.* at ¶¶ 4, 52. In addition, plaintiff alleges that the earthquake risks in Oklahoma are now the highest in the nation, on a par with California. *Id.* at ¶¶ 5, 36. According to plaintiff, the earthquakes induced by defendants' waste disposal activities present an imminent and substantial endangerment to the public health or environment. *Id.* at ¶¶ 2, 59, 62, 84. Plaintiff alleges that waste-induced earthquakes have already

---

**1.** Plaintiff also named SandRidge Exploration and Production, LLC as a defendant in its amended complaint. Upon notice of pendency of bankruptcy proceedings, the action against defendant SandRidge was stayed pursuant to 11 U.S.C. § 362. *See,* Order, doc. no. 83.

caused property damage and harm to individuals. *Id.* at ¶¶ 3, 55. It further alleges that there is a real danger that if an earthquake of a magnitude greater than six occurs, storage tanks for oil and other products could be ruptured, pipes carrying oil, gas, or other chemicals could fail, and other damage to infrastructure could occur. *Id.* at ¶ 56.

To reduce the substantial risk of harm from waste-induced earthquakes, plaintiff seeks an order from this court requiring (1) defendants "to reduce immediately and substantially the amounts of [wastes] they are injecting into the ground to levels that seismologists believe will not cause or contribute to increased earthquake frequency and severity;" (2) defendants "to reinforce vulnerable structures that current forecasts indicate could be impacted by large magnitude earthquakes" during the period of time it takes the earthquake risk to return to natural background; and (3) "the establishment of an independent earthquake monitoring and prediction center to determine the amount of [wastes] which may be injected into a specific well or formation before induced seismicity occurs." *See,* First Amended Complaint for Declaratory and Injunctive Relief (doc. no. 49), ¶¶ 6, 8, 9 and p. 28.

In their motions, defendants seek to dismiss plaintiff's amended complaint pursuant to Rule 12(b)(1) and Rule 12(b)(6), Fed. R. Civ. P. Defendants argue that the court should decline to exercise jurisdiction over this action under the Burford abstention and primary jurisdiction doctrines because the Oklahoma Corporation Commission has taken action in response to the increased seismicity caused by wastewater disposal activities. In addition, defendants argue that plaintiff's amended complaint should be dismissed because plaintiff has not joined every company that is disposing of liquid wastes from oil and gas extraction activities into injection wells. Defendants further argue that plaintiff's amended complaint should be dismissed because its claims against defendants fall outside the zone of interests Congress intended to protect under RCRA and are additionally barred by RCRA's anti-duplication provision.

After careful consideration, the court has concluded that dismissal of this action is appropriate under the Burford abstention and primary jurisdiction doctrines. In light of the court's decision, the court need not address the remaining arguments raised by defendants in support of dismissal.

Discussion

A. Legal Standard

 A motion to dismiss based upon abstention and primary jurisdiction grounds may be decided under Rule 12(b)(1), Fed. R. Civ. P. *See,* Williams v. Pucinski, 2002 WL 1585571, at *2 (N.D. Ill. July 12, 2002); *see also,* McCormick v. Halliburton Co., 2012 WL 1119493, at *1, *3 (W.D. Okla. April 3, 2012); Hanlin Group, Inc. v. Power Authority of State of New York, 703 F.Supp. 305, 306 (S.D.N.Y. 1989); *see generally,* 5B Wright & Miller, Federal Practice and Procedure § 1350 (3d ed. 2016). Thus, the court may consider materials outside the pleadings in deciding whether to dismiss on these grounds without converting the motion into one for summary judgment. *See,* Stein v. Legal Advertising Committee of Disciplinary Board, 272 F.Supp.2d 1260, 1263 n. 3 (D. N.M. 2003); Williams, 2002 WL 1585571, at *2.

B. Relevant Statutory and Regulatory Framework

I.

The Safe Drinking Water Act ("SDWA"), 42 U.S.C. § 300f, *et seq.,* enacted in 1974, establishes a regulatory

mechanism to insure the quality of publicly supplied drinking water. *See,* Phillips Petroleum Co. v. U.S. E.P.A., 803 F.2d 545, 547 (10th Cir. 1986). Part C of the SDWA establishes a regulatory program for the protection of underground sources of drinking water. *Id.; see also,* 42 U.S.C. §§ 300h to 300h–8. The program requires the United States Environmental Protection Agency ("EPA") to promulgate regulations that set forth minimum requirements for state underground injection control ("UIC") programs. *See,* 42 U.S.C. § 300h. A state must submit to the EPA a proposed UIC program that meets the minimum requirements, and must receive EPA approval, in order to obtain primary regulatory and enforcement responsibility for underground injection activities within that state. *See,* 42 U.S.C. § 300h–1. The state retains primary responsibility until the EPA determines, by rule, that the state UIC program no longer meets the minimum requirements established under the SDWA. *See,* 42 U.S.C. § 300h–1(b)(3).

In 1981, the EPA approved Oklahoma's application for underground injection control primacy for the entire state except the Osage Indian Reserve. *See,* Phillips Petroleum Co., 803 F.2d at 549. In particular, the EPA granted "primary enforcement responsibility to the State of Oklahoma for the Underground Injection Control (UIC) program for oil and natural gas related recovery and production injection wells," which are designated by the EPA as Class II wells. 46 Fed. Reg. 58488–02, 1981 WL 148185 (Dec. 2, 1981). By statute, Oklahoma has vested the Oklahoma Corporation Commission ("OCC") "with exclusive jurisdiction, power and authority, and it shall be its duty to promulgate and enforce rules, and issue and enforce orders governing and regulating: [ ] injection wells

known as Class II wells under the federal Underground Injection Program." 52 O.S. 2011 § 139(B)(1)(f).

## II.

The OCC exercises its exclusive jurisdiction over Class II wells through a comprehensive system of permit adjudication. The OCC must approve every Class II well. *See,* Oklahoma Administrative Code ("OAC") 165:10–5–2(a) ("The subsurface injection or disposal of any substance for any purpose is prohibited except upon approval of the Commission . . . ."). Applicants for Class II well permits are required to provide extensive information, including a plat, a completion report, a schematic design of the well, proposed zone information, and proposed operating data. *See,* OAC 165:10–5–5(b). Applicants must also provide notice of the application in newspapers in both Oklahoma County and the county where the well is located. *See,* OAC 165:10–5–5(d). If a written objection to the application is filed, the application is set for hearing before the OCC. *See,* OAC 165:10–5–5(e).

An order or permit granting an underground injection application may be suspended, modified, vacated, amended, or terminated during its term for cause. *See,* OAC 165:10–5–9(b). This may be at the OCC's initiative or at the request of any interested person through prescribed procedures. *Id.* An order or permit may be suspended or temporarily modified by the OCC pursuant to 52 O.S. 2011 § 139(D)(1) or other applicable authority. *See,* OAC 165:10–5–9(c). Section 139(D) (1) permits the OCC to "take whatever necessary action" to promptly respond to "emergency situations having potentially critical environmental or public safety impact." *See,* 52 O.S. 2011 § 139(D)(1).[2] The OCC also

---

**2.** In 2016, 17 O.S. § 52 was also amended to authorize the OCC to "take whatever action is necessary" to promptly respond to "emergen-

cy situations having potentially critical environmental or public safety impact." 17 O.S. § 52 (A)(8)(D).

may shut down or take other action regarding a well pursuant to § 139(D)(1), to address matters including, but not limited to, seismic activity. *See*, OAC 165:10–5–7(g). Further, an order or permit may be permanently modified, vacated, amended, or terminated after notice and hearing if "[i]nformation as to the permitted operation indicates that the cumulative effects on the environment are unacceptable." OAC 165:10–5–9(d).

Further, Section 112 of Title 52 of the Oklahoma Statutes provides that "any person" affected by a legislative or administrative order by the OCC has the right at any time to apply to the OCC to repeal, amend, modify, or supplement the same. *See*, 52 O.S. 2011 § 112. The application must be heard as expeditiously as possible and any appeal of the decision lies with the Oklahoma Supreme Court. *Id.*

### III.

RCRA, enacted in 1976, establishes a comprehensive "cradle-to-grave" program regulating the generation, transportation, storage, treatment and disposal of solid and hazardous waste. Solid waste includes liquid waste. *See*, 42 U.S.C. § 6903(27). In 1984, Congress amended RCRA to allow private citizens to enforce RCRA's provisions in some circumstances. Section 7002(a)(1)(B) of RCRA permits a private party to bring suit against "any person" who "has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment." 42 U.S.C. § 6972(a)(1)(B).[3] Section 6972(a) requires the action under § 6972(a)(1)(B)

to be brought in the "district court for the district in which . . . the alleged endangerment may occur." 42 U.S.C. § 6972(a). It authorizes the district court to "restrain any person who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste" or "to order such person to take such other action as may be necessary." *Id.*

### C. OCC and State Action

In 2013, the OCC, in response to seismic activity in Oklahoma, adopted a "traffic light" system for Class II disposal wells. The system, recommended by the National Academy of Sciences, directs staff to review disposal well permits for proximity to faults, seismicity in the area and other factors. No permits are issued for disposal wells that meet "red light" seismic criteria. For wells that present lesser seismicity concerns, the OCC uses "yellow light" procedures. "Yellow light" permits are temporary. Issuance requires: a public hearing, monitoring for background seismicity, periodic shut down for bottom hole pressure readings, and mandatory shut down in the event of defined seismic activity. *See*, Chesapeake's brief in support, ex. 10 and ex. 12; Devon's memorandum in support, ex. 7.

The OCC also adopted rules, effective in September of 2014, requiring daily recording of well pressure and volume for disposal wells that inject into the Arbuckle formation, a deep formation in Oklahoma. The rules additionally require all disposal wells permitted for 20,000 barrels per day to conduct mechanical integrity tests. *See*,

---

**3.** However, no action can be commenced under § 6972(a)(1)(B) prior to ninety days after the plaintiff has given notice of the endangerment to the EPA's Administrator, the state in which the alleged endangerment may occur, and any person alleged to have contributed or

to be contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste. See, 42 U.S.C. § 6972(b)(2)(A). There is no contention here that plaintiff did not provide the required notice.

Chesapeake's brief in support, ex. 7 and ex. 8; Devon's memorandum in support, ex. 7.

In September of 2014, the Governor of Oklahoma formed the Coordinating Council on Seismic Activity. *See,* Chesapeake's brief in support, ex. 5. That body's primary responsibility is to coordinate and share information across state agencies and the state's oil and gas industry, identify gaps in resources, and work cooperatively to develop solutions for seismic activity. Two state legislators serve on the council to help ensure an efficient flow of information between state agencies and the legislature. *Id.* at ex. 9. In January of 2016, the Governor approved the transfer of nearly $1.4 million in emergency funds to fully fund the requests of the OCC and the Oklahoma Geological Survey in aid of their research and response to earthquakes. *Id.* at ex. 26.

In 2015 and 2016, the OCC issued numerous directives to Class II disposal well operators to reduce disposal volumes or to stop operations. *See,* Chesapeake's brief in support, ex. 24. In mid–February and again in early March, 2016, the OCC implemented volume reduction plans which required a 40% reduction in disposal for over 600 wells in western and central Oklahoma injecting wastewater into the Arbuckle formation. The OCC also expanded the area of interest in order to place more wells under the "yellow light" procedures. *See,* Chesapeake's brief in support, ex. 27 and ex. 28; Devon's memorandum in support, ex. 8 and ex. 9.

The reduction plans, when taken in conjunction with previous actions by the OCC, have reduced the total disposed volume of wastewater in Class II disposal wells by approximately 800,000 barrels a day from 2014 levels and thus far has involved actions affecting about 700 Arbuckle disposal wells. The volume reduction area covers about 11,000 square miles, and a 15,000 square mile area of interest has been established. All wells in the Arbuckle formation must report disposal volumes weekly. *See,* Earthquake Response Summary found at www.occeweb.com.[4]

On February 24, 2017, the OCC reported the issuance of a new directive, dated February 22, 2017, aimed at limiting the growth in future disposal rates into the Arbuckle formation. The OCC made adjustments to the distribution of volume allotments as outlined in directives issued prior to December of 2016 for the Oklahoma central and western reduction areas. It imposed additional limits for wells within the area of interest but not under any previous directive. The instructions given by the OCC are mandatory and to be implemented immediately. *See,* Recent Actions in Earthquake Response Summary found at www.occeweb.com.

### D. Burford Abstention

 The Burford[5] abstention doctrine counsels that

> [w]here timely and adequate state-court review is available, a federal court sitting in equity must decline to interfere with the proceedings or orders of state administrative agencies: (1) when there are difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar; or (2) where the exercise of federal review of the question in a case and in similar cases would be disruptive of

---

4. The court takes judicial notice of the Earthquake Response Summary pursuant to Rule 201, Fed. R. Evid., as the information can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.

5. Burford v. Sun Oil Co., 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943).

state efforts to establish a coherent policy with respect to a matter of substantial public concern.

Western Ins. Co. v. A and H Ins., Inc., 784 F.3d 725, 727 (10th Cir. 2015) (quoting New Orleans Public Service, Inc. v. Council of New Orleans ("NOPSI"), 491 U.S. 350, 361, 109 S.Ct. 2506, 105 L.Ed.2d 298 (1989)). The Burford abstention doctrine is concerned with protecting complex state administrative processes from undue federal influence. See, NOPSI, 491 U.S. at 362, 109 S.Ct. 2506. If abstention under Burford is appropriate, the court, sitting in equity, may decline to exercise jurisdiction by dismissing the case. Quackenbush v. Allstate Ins. Co., 517 U.S. 706, 721, 116 S.Ct. 1712, 135 L.Ed.2d 1 (1996). The court concludes that the Burford abstention doctrine is applicable to this case.

First, plaintiff has only requested declaratory and injunctive relief in its amended pleading. Thus, the court is "sitting in equity" for purposes of plaintiff's RCRA action.

Second, Burford abstention is permitted "where the exercise of federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern." NOPSI, 491 U.S. at 361, 109 S.Ct. 2506 (quotation omitted). Both federal and state law have made the OCC the primary regulator of Class II wastewater injection wells in Oklahoma. The OCC has established and is operating its own authorized program to regulate these wells. As part of its authority, the OCC has taken action to address the seismic activity which plaintiff maintains is linked to the Arbuckle disposal wells. The OCC, as discussed above, has implemented a traffic light system for disposal well permits, has issued new rules for wells that' dispose wastewater in the Arbuckle formation, and has issued directives either to reduce disposal of waste-

water in the Arbuckle formation or to stop operations altogether. It has also recently issued a new directive aimed at limiting the future growth of disposal rates into the Arbuckle formation. As will be seen, it is worthy of note that the OCC's recently-promulgated directives are mandatory. The OCC's coordinated response to seismicity encompasses large numbers of wells and operators across much of the State of Oklahoma. It encompasses many more wells than are operated by the defendants in this case. Federal review at this juncture would be disruptive of the OCC's efforts to establish a coherent policy with respect to seismic activity relating to the disposal wells. Furthermore, seismicity is a substantial public concern. This is evident not only from the actions taken by the OCC to address the issue but also from the decision of the Governor of Oklahoma to form a Coordinating Council on Seismic Activity and to approve emergency funding to the OCC and the Oklahoma Geological Survey to aid in their research and response to earthquake activity. This substantial public concern is further evidenced by the Oklahoma Legislature's decision to recently amend 17 O.S. § 52 to clarify that the OCC is authorized to "take whatever action is necessary" to promptly respond to "emergency situations having potentially critical environmental or public safety impact." 17 O.S. § 52 (A)(8)(D).

Third, the court concludes that timely and adequate state-court review is available to plaintiff. Although plaintiff argues that this court has exclusive jurisdiction over RCRA claims, the primary relief plaintiff seeks is the immediate and substantial reduction of the amounts of wastewater injected by defendants. This relief may be obtained from the OCC. In fact, the OCC has been taking the action requested by plaintiff, and its latest directive is mandatory. Moreover, any order or permit granting approval of underground in-

jection may be suspended, modified, vacated, amended or terminated during its term for cause. *See*, OAC 165:10–5–9(b). It can also be suspended or temporarily modified pursuant to 52 O.S. § 139(D)(1). *See*, OAC 165:10–5–9(c). The OCC may shut down or take other action pursuant to § 139(D)(1) to address seismic activity. In addition, pursuant to 17 O.S. § 52(A)(8)(D), the OCC may take "whatever action is necessary" to address emergency situations. Further, Section 112 of Title 52 of the Oklahoma Statutes provides that any person affected by a legislative or administrative order of the OCC shall have the right to apply to the OCC to repeal, amend, modify, or supplement the same. The application must be considered by the OCC as expeditiously as possible and any appeal lies with the Oklahoma Supreme Court. The court concludes that, by way of these procedures, plaintiff does have timely and adequate recourse to obtain its requested primary relief. (And, as is discussed elsewhere in this order, the OCC is much better equipped to provide timely and effective relief.)

Plaintiff points out that in its amended pleading it also seeks relief under RCRA in the form of an order requiring defendants to reinforce vulnerable structures that current forecasts indicate could be affected by major earthquakes, as well as the establishment of an independent earthquake monitoring and prediction center to determine the amount of wastewater that may be injected into a specific well or formation before induced seismicity occurs. Although RCRA provides that the court has jurisdiction to "to order such person to take such other action as may be necessary," *see*, § 6972(a), the court has found no authority to support a requirement, mandated by this court, that the defendants reinforce vulnerable structures, including vulnerable structures owned by third parties who are not before the court seeking that relief. Moreover, the relief plaintiff seeks in the form of an earthquake monitoring and prediction center in order to determine the amount of wastewater that may be injected into a specific well is plainly redundant to the ongoing and data-driven regulatory activities of the OCC. The OCC, with the assistance of other agencies and researchers, is working to determine the amount of wastewater that may be injected into disposal wells.

In its papers, plaintiff cites cases from other circuits in which the courts have rejected Burford abstention in RCRA cases due to the exclusivity of federal jurisdiction over such claims. The court notes, however, that the Supreme Court specifically stated in Burford that "[a]lthough a federal equity court does have jurisdiction of a particular proceeding, it may ... whether its jurisdiction is invoked on the ground of diversity of citizenship *or otherwise*, refuse to enforce or protect legal rights, ...." Burford, 319 U.S. at 317–318, 63 S.Ct. 1098. (quotation omitted and emphasis added); *see also*, Quackenbush, 517 U.S. at 718, 116 S.Ct. 1712 ("[W]e have recognized that the authority of a federal court to abstain from exercising its jurisdiction extends to *all* cases in which the court has discretion to grant or deny relief.") (emphasis added). Moreover, as has been noted, the primary relief that plaintiff seeks for its RCRA claims is available from the OCC. The court therefore concludes that it may abstain from exercising jurisdiction over plaintiff's claims, despite the fact they are brought under RCRA.

The court acknowledges that it has a "virtually unflagging obligation" to exercise jurisdiction given to it. *See*, Quackenbush, 517 U.S. at 716, 116 S.Ct. 1712 (quotation omitted). However, "the power to dismiss recognized in Burford represents an extraordinary and narrow exception to the duty of the District Court to adjudicate a controversy properly before it." *Id.* at

728, 116 S.Ct. 1712 (quotation omitted). The court concludes that this case does fall within the Burford abstention doctrine. Consequently, the court finds that dismissal of plaintiff's RCRA claims is warranted.

### E. Primary Jurisdiction

#### I.

■■■ As with the concept of Burford abstention, the primary jurisdiction doctrine is concerned with protecting the administrative process from judicial interference. See, United States v. W. Pac. R. Co., 352 U.S. 59, 63, 77 S.Ct. 161, 1 L.Ed.2d 126 (1956). The doctrine "is invoked in situations where the courts have jurisdiction over the claim from the very outset but it is likely that the case will require resolution of issues which, under a regulatory scheme, have been placed in the hands of an administrative body." Marshall v. El Paso Natural Gas Co., 874 F.2d 1373, 1376 (10th Cir. 1989). Under the doctrine, a court may refer issues, not within the conventional experience of the court or falling within the realm of administrative discretion, to the administrative agency having more specialized experience, expertise, and insight on the matter. See, Williams Pipe Line Co. v. Empire Gas Corp., 76 F.3d 1491, 1496 (10th Cir. 1996). The doctrine of primary jurisdiction is concerned with "promoting proper relationships between the courts and administrative agencies charged with particular regulatory duties." Id. (quotation omitted). "In essence, the doctrine represents a determination that administrative agencies are better equipped than the courts to handle particular questions, and that referral of appropriate questions to an agency ensures desirable uniformity of results." Id.

■■■ In the Tenth Circuit, a district court's decision to invoke the primary jurisdiction doctrine "require[s] it to consider whether the issues of fact in the case: (1) are not within the conventional experience of judges; (2) require the exercise of administrative discretion; or (3) require uniformity and consistency in the regulation of the business entrusted to the particular agency." TON Services, Inc. v. Qwest Corp., 493 F.3d 1225, 1239 (10th Cir. 2007) (quotation omitted). Id. "Additionally, when the regulatory agency has actions pending before it which may influence the instant litigation, invocation of the doctrine may be appropriate." Id. There is, however, no fixed formula for applying the doctrine. Id. "Courts should consider case-by-case whether the reasons for the existence of the doctrine are present and whether the purposes its serves [i.e. uniformity and resort to administrative expertise] will be aided by its application in the particular litigation." Id. (quotation omitted).

■■■ Additionally, district courts in the Tenth Circuit, addressing the issue in RCRA cases, have applied five factors in deciding the doctrine's applicability. These factors include: (1) whether the court is being called upon to decide factual issues not within the conventional experience of judges: (2) whether defendants could be subjected to conflicting orders of both the court and the administrative agency; (3) whether relevant agency proceedings have actually been initiated; (4) whether the agency has demonstrated diligence in resolving the issues or has instead allowed the issues to anguish; and (5) the type of relief requested by plaintiff. See, Friends of Santa Fe County v. LAC Minerals, Inc., 892 F.Supp. 1333, 1349–1350 (D. N.M. 1995); see also, McCormick, 2012 WL 1119493, at *2; B.H. v. Gold Fields Mining Corp., 506 F.Supp.2d 792, 803 (N.D. Okla. 2007); Wilson v. Amoco Corp., 989 F.Supp. 1159, 1169 (D. Wyo. 1998); Davies v. National Co-op. Refinery Ass'n, 963 F.Supp. 990, 997–998 (D. Kan. 1997).

 "When the primary jurisdiction doctrine is invoked, the judicial process is suspended pending referral of such issues to the administrative body for its views." TON Services, Inc., 493 F.3d at 1239 (quotation omitted). The court's referral does not automatically divest the court of jurisdiction. Id. The court may retain jurisdiction over the proceedings by staying plaintiff's claims pending agency action. However, if neither party will be unfairly disadvantaged, the court may dismiss the case without prejudice. Id.

## II.

Considering the relevant factors, the court concludes that primary jurisdiction to redress the harm alleged by plaintiff rests with the OCC.

 First, in the court's view, the factual issues to be decided for plaintiff's RCRA endangerment claim are not within the conventional experience of judges. This case is not the sort that a court routinely considers. Marshall, 874 F.2d at 1376. Indeed, plaintiff has not cited any RCRA endangerment cases similar to the case at bar. The cases cited by plaintiff primarily involve contamination at or from a single, discrete site. See, plaintiff's response, pp. 25 and 26 & n. 8 and n. 9. This case involves the disposal of wastewater in numerous disposal wells located across thousands of square miles in Oklahoma. Plaintiff is asking the court to determine whether defendants have contributed or are contributing "to the past or present handling, storage, treatment transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment." 42 U.S.C. 6972(a)(1)(B). Although plaintiff maintains that the "scientific consensus" supports its claims and that the court will only "need to review the scientific evidence and determine which of the defendants have contributed to the increase in seismic activity," see,

plaintiff's response, p. 28, the court nonetheless concludes that the technical issues involved in deciding plaintiff's RCRA claims are not the same as those present in the typical RCRA endangerment case. Moreover, the remedy plaintiff seeks, the immediate and substantial reduction of wastewater by defendants, requires the court to determine the amount of wastewater that is acceptable to avoid seismic activity. This is a highly complex and technical issue. Plaintiff recognizes that the court lacks the particular expertise to craft an injunction, if liability is found, because it requests the court to utilize what "seismologists" believe to determine the amount of wastewater that can be injected in defendants' disposal wells so as not to increase earthquake frequency and severity. It also requests to the court to establish an independent earthquake monitoring and prediction center to forecast the volume of wastewater which can be injected into a particular well. The court recognizes that courts have determined that questions posed by environment statutes are "not so esoteric or complex as to foreclose their consideration by the judiciary." College Park Holdings, LLC v. Racetrac Petroleum, Inc., 239 F.Supp.2d 1322, 1328 (N.D. Ga. 2002); Wilson, 989 F.Supp. at 1170. However, this case does not concern the enforcement of pollution regulations. Id. ("Enforcement of pollutions regulations is not a technical matter beyond the competence of the courts.") (quotation omitted). The relief sought by plaintiff would require the court to operate (and this would amount more to regulation than adjudication) at the confluence of several areas of expertise, including geology, geophysics, hydraulics and petroleum engineering, to say nothing of seismology. To be sure, judges of courts of general jurisdiction are not infrequently dragged kicking and screaming into technical fields in situations in which they are left with no

choice but to feign technical competence.[6] But this court is clearly not confronted with that "no choice" situation here.

The short of the matter is that the OCC, aided, if necessary, by other agencies (including the United States Geological Survey and Oklahoma Geological Survey) and researchers, is better equipped than the court to resolve the seismicity issues relating to disposal well activities, "by specialization, by insight gained through experience, and by more flexible procedure." Far East Conference v. U.S., 342 U.S. 570, 575, 72 S.Ct. 492, 96 L.Ed. 576 (1952).[7]

 Second, the court finds that defendants could be subjected to conflicting orders of both the court and the OCC, should the court rule in plaintiff's favor. In 2015 and 2016, the OCC issued directives to reduce volumes of disposal of wastewater or to stop operations. Although those directives were voluntary, the OCC has recently issued mandatory instructions for volume reduction. If this court were to rule in favor of plaintiff, any order directing the immediate and substantial reduction of volumes of wastewater would be in conflict with the OCC's mandatory instructions. One of the purposes of primary jurisdiction is promote uniformity and consistency in the regulation of the business entrusted to the administrative agency. TON Services, Inc., 493 F.3d at 1239. Here, injunctive relief even approaching the scope of that sought by plaintiff would disrupt the uniformity and consistency of the OCC's regulation of disposal wells in response to seismic activity. Plaintiff has sued four defendants in this case. While plaintiff asserts that these defendants account for over 60% of the injection of wastewater into the Arbuckle formation, there are other operators disposing of almost 30% of the wastewater. The court's injunction would not cover all of the operators disposing of wastewater and could interfere with the OCC's reduction plans, which encompass *all* operators under its jurisdiction. The OCC has implemented its reduction plans so as to prevent sudden pressure changes—a task that clearly requires technical expertise from several fields. And here is where the essential differences between courts and regulatory agencies are brought into high relief: The OCC is equipped, as a regulatory body, to apply *continuous, persistent* and *flexible* regulatory power to the oil and gas operators. This is one situation in which fast, effective administrative action will outdo the judicial process every time. At the OCC, as practi-

---

**6.** For instance, as Justice Breyer has observed, in a Daubert context: "neither the difficulty of the task nor any comparative lack of expertise can excuse the judge from" performing his gatekeeper function. General Electric Co. v. Joiner, 522 U.S. 136, 148, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997) (Breyer, J., concurring). One supposes that district judges should appreciate the implicit compliment. But that does not mean that a district judge is obliged to wade into an area of expertise that is demonstrably within the competence of a regulatory body which is indisputably vested with authority to address the problem a plaintiff seeks to lay before the court.

**7.** The court recognizes that plaintiff has expressly stated that it would have the court defer to seismologists to determine what injection volumes "will not cause or contribute to increased earthquake frequency and severity." First Amended Complaint for Declaratory and Injunctive Relief (doc. no. 49), at p. 28. The court is requested to use its injunctive power to bind the parties to what "seismologists believe" will solve the problem. *Id.* But lest it be thought that this proposed deference by the court to what "seismologists believe" is an acceptable solution to the expertise problem, the court will observe that that sort of delegation of judicial power, even if legally sustainable (perhaps a dubious proposition, or at least a proposition clinging to the ragged edge of the court's equitable discretion), would inevitably, one way or another, leave the court exposed to eventual (and perhaps repeated) demands that it substitute its "expertise" for that of the scientists.

tioners before it sometimes lament (depending on whose ox is being gored), the dictates of due process need not always be honored within the confines of a district court-like procedural framework, with all of its time-honored and time-consuming formalities. As for the specter of conflict between orders from this court versus orders from the OCC, it is true that some courts have concluded that the possibility of implementation of stricter remediation standards by a federal court is not the sort of interference that will call for the application of the primary jurisdiction doctrine. *See*, Baykeeper v. NL Industries, Inc., 660 F.3d 686, 692 (3d Cir. 2011); In re Methyl Tertiary Butyl Ether Products Liability Litigation, 476 F.Supp.2d 275, 281 (S.D. N.Y. 2007); Lambrinos v. Exxon Mobil Corp., 2004 WL 2202760, at *6 (N.D. N.Y. Sept. 29, 2004); Maine People's Alliance v. Holtrachem Mfg. Co., L.L.C., 2001 WL 1602046, at *8 (D. Me. Dec. 14, 2001). But this case does not involve the remediation of contamination, wherein a stricter standard might not conflict unacceptably with a lesser standard imposed by an agency. An application of a stricter standard in this case (*e.g.*, greater reduction of wastewater injection than mandated by the OCC), could increase the risk of harm. In the court's view, the clear need for uniformity and consistency in addressing seismic activity is better served by deference to the OCC.

Third, even though the OCC has not initiated any formal agency proceedings, it has nonetheless taken a series of actions, in response to seismic activity, to reduce the volume of wastewater injected into disposal wells. The OCC has specifically advised that it will take legal action for any failure to comply with its mandatory instructions. Courts have stated that "[i]t is axiomatic that the advisability of invoking primary jurisdiction is greatest where the issue is already before the agency." Friends of Santa Fe County, 892 F.Supp. at 1350 (quotation omitted). The issues involved in this case are clearly before the OCC, and they clearly do have the attention of that agency.

Fourth, the OCC has demonstrated diligence in resolving the issues. In its amended pleading, plaintiff alleges that "no government body is currently taking a holistic or proactive view of waste injection and its potential to induce earthquakes." *See*, First Amended Complaint for Declaratory and Injunctive Relief (doc. no. 49), ¶ 9. However, in its briefing, plaintiff concedes that "OCC has been taking an escalating series of voluntary measures to curtail injection." Plaintiff's response, p. 29. In addition to these measures, the OCC, as has been noted, has recently instituted *mandatory* measures to reduce injection rates. These actions show that OCC has acted diligently in addressing seismicity potentially triggered by disposal wells.

Fifth and finally, the type of relief requested by plaintiff is declaratory and injunctive relief. The doctrine of primary jurisdiction is more readily applicable if injunctive relief, requiring scientific or technical expertise, is requested. Schwartzman, Inc. v. Atchison, Topeka & Santa Fe Ry. Co., 857 F.Supp. 838, 843 (D. N.M. 1994); *see also*, Gold Fields Mining Corp., 506 F.Supp.2d at 805 ("Primary jurisdiction will often be invoked when a plaintiff seeks injunctive relief, because there is the greatest likelihood that a court's order will interfere with administrative agency's proceedings."). Here, the primary injunctive relief requested by plaintiff is the immediate and substantial reduction of wastewater disposal. This requested relief requires scientific and technical expertise, which the OCC and its collaborators possess. Because the relief requested is what the OCC can grant, the court concludes that primary jurisdiction should lie with the OCC.

### III.

As has been noted, dismissal of an action on primary jurisdiction grounds is appropriate when the parties will not be prejudiced or unfairly disadvantaged. TON Services, Inc., 493 F.3d at 1242–1243. This is the case when the relief sought is a declaratory judgment or an injunction or when the statute of limitations will not preclude a future action. Id. at 1243. Here, plaintiff seeks declaratory and injunctive relief. In addition, there is no statute of limitations applicable to plaintiff's RCRA claim. See, Lefebvre v. Central Maine Power Co., 7 F.Supp.2d 64, 68 (D. Me. 1998); A–C Reorganization Trust v. E.I. DuPont de Nemours & Co., 968 F.Supp. 423, 427–28 (E.D. Wis. 1997); Nixon–Egli Equipment Co. v. John A. Alexander Co., 949 F.Supp. 1435, 1440–41 (C.D. Cal. 1996). Because no party will be prejudiced or unfairly disadvantaged by a dismissal rather than a stay, the court concludes that plaintiff's action should be dismissed without prejudice based upon invocation of the doctrine of primary jurisdiction.

Plaintiff's Action Against Defendant, SandRidge Exploration and Production, LLC

As previously noted, the action against defendant, SandRidge Exploration and Production, LLC, has been stayed by the court pursuant to 11 U.S.C. § 362. See, doc. no. 83. In light of the stay, the court cannot direct the entry of a final judgment dismissing without prejudice plaintiff's amended complaint against the three moving defendants based upon the Burford abstention and primary jurisdiction doctrines unless the court expressly determines that there is no just reason for delay as required by Rule 54(b), Fed. R. Civ. P. The court declines to make such a determination sua sponte and on the basis of the record before it.

Nonetheless, for clarity of the record, the court shall direct plaintiff to file a written notice advising whether or not the automatic stay of civil proceedings against defendant, SandRidge Exploration and Production, LLC, has been lifted and plaintiff's intention, if any, with respect to prosecuting its amended complaint against said defendant.

Conclusion

Every night, more than a million Oklahomans go to bed with reason to wonder whether they will be awakened by the muffled boom which precedes, by an instant, the shaking of the ground under their homes. Responding to this earthquake activity is serious business, requiring serious regulatory action. The record in this case plainly demonstrates that the Oklahoma Corporation Commission has responded energetically to that challenge. Of equal importance, it is plain that the Oklahoma Corporation Commission has brought to bear a level of technical expertise that this court could not hope to match. The challenge of determining what it will take to meaningfully reduce seismic activity in and near the producing areas of Oklahoma is not an exact science, but it is no longer one of the black arts. This court is ill-equipped to outperform the Oklahoma Corporation Commission in advancing that science and putting the growing body of technical knowledge to work in the service of rational regulation.

Accordingly, based upon the foregoing, Defendant Devon Energy Production Company, L.P.'s Motion to Dismiss Plaintiff's Complaint (doc. no. 59), Defendant New Dominion, LLC's Motion to Dismiss Plaintiff's First Amended Complaint for Declaratory and Injunctive Relief (doc. no. 61), and the Motion of Defendant Chesapeake Operating, L.L.C. to Dismiss Plaintiff's First Amended Complaint (doc. no. 63) are **GRANTED**.

Plaintiff, Sierra Club, is **DIRECTED** to file, within seven business days, a written notice advising whether or not the

automatic stay of civil proceedings against defendant, SandRidge Exploration and Production, LLC, has been lifted and plaintiff's intention, if any with respect to prosecuting its amended complaint against said defendant.

IT IS SO ORDERED this 4th day of April, 2017.